61 Cal.Rptr.3d 845 (2007)
152 Cal.App.4th 808
EPISCOPAL CHURCH CASES.
Nos. G036096, G036408, G036868.
Court of Appeal of California, Fourth District, Division Three.
June 25, 2007.
*847 Holme Roberts & Owen, John R. Shiner, Los Angeles, Brent E. Rychener; Horvitz & Levy, Frederic Cohen and Jeremy Rosen, Encino, for Plaintiffs and Appellants.
Goodwin Procter, David Booth Beers, Heather H. Anderson and Matthew J. Wilshire, for Intervener and Appellant.
Payne & Fears, Eric C. Sohlgren, Benjamin A. Nix and Daniel F. Lula, Irvine, for Defendants and Respondents.
Law Offices of George S. Burns, George S. Burns and John C. Ashby, Newport Beach, as Amici Curiae for the Presbyterian Church (U.S.A.), The Synod of Southern California and Hawaii, and Presbytery of Hanmi on behalf of Plaintiffs and Appellants.

*846 OPINION
SILLS, P. J.

I. SUMMARY
This appeal stems from a classic dispute over church property where a local congregation of a general church seeks to disaffiliate itself from that general church and take the local church property with it. (See generally Baker v. Ducker (1889) 79 Cal. 365, 21 P. 764 (Baker); N.L. Wheelock v. First Presbyterian Church of Los Angeles (1897) 119 Cal. 477, 51 P. 841 (Wheelock); Horsman v. Allen (1900) 129 Cal. 131, 61 P. 796 (Horsman); Committee of Missions v. Pacific Synod (1909) 157 Cal. 105, 106 P. 395 (Committee of Missions); see also Rosicrucian Fellowship v. Rosicrucian Fellowship Nonsectarian Church (1952) 39 Cal.2d 121, 245 P.2d 481 (Rosicrucian Fellowship); Providence Baptist Church v. Superior Court (1952) 40 Cal.2d 55, 251 P.2d 10 (Providence Baptist).)
But this appeal is about more than a church property dispute. It is also about the rule of stare decisis. As we shall *848 explain below, in no less than six California Supreme Court opinions, our state's highest court, taking its cue from the United-States Supreme Court decision in Watson v. Jones (1871) 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (Watson), consistently used a "principle of government" or "highest church judicatory" approach to resolve disputes over church property, an approach it applied to hierarchically organized churches and non-hierarchically organized churches alike.
However, in 1979, a panel of the intermediate California Court of Appeal came to the belief that this line of consistent California Supreme Court cases should be ignored, and that a new approach, called "neutral-principles analysis" was the appropriate California common law approach to church property disputes. (Presbytery of Riverside v. Community Church of Palm Springs (1979) 89 Cal. App.3d 910, 152 Cal.Rptr. 854 (Church of Palm Springs)). Neutral principles is a. four-factor analysis for use in church property disputes, that typically examines (1) title, (2) articles of incorporation, (3) a church's constitution, canons and rules, and (4) state statutes.
The Church of Palm Springs court came to its conclusion based on its reading of a quartet of United States Supreme Court cases decided in the previous decade. (See Presbyterian Church v. Hull Church (1969) 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (Hull Church); Eldership v. Church of God at Sharpsburg (1970) 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (Eldership); Serbian Eastern Orthodox Diocese v. Milivojevich (1976) 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (Serbian Eastern Orthodox); and Jones v. Wolf (1979) 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (Jones)).
In this opinion we shall explain in detail why those federal high court opinions did not overrule (either expressly or impliedly), or even alter in any way, the existing common law approach used by the California Supreme Court in Baker, Wheelock, Horsman, Committee of Missions, Rosicrucian Fellowship, or Providence Baptist. In this opinion we shall refer to these cases collectively as the "Baker-Wheelock line."
Another panel of California's intermediate appellate court followed Church of Palm Springs in the case of Protestant Episcopal Church in the Diocese of Los Angeles v. Barker (1981) 115 Cal.App.3d 599, 171 Cal.Rptr. 541 (Barker). The Barker court, however, did not independently examine the United States Supreme Court authorities which the Church of Palm Springs court had cited as authority to ignore the Baker-Wheelock line, or the Church of Palm Springs' reading of the California Supreme Court cases, particularly Wheelock. The Barker court simply assumed that the Church of Palm Springs decision had been correct in upsetting the stable legal universe that existed in California up until that time in the name of "neutral principles."
Thereafter, California intermediate appellate courts have given lip service to "neutral principles," but have come to results that are sometimes difficult, if not impossible, to reconcile with each other. In Korean United Presbyterian Church v. Presbytery of the Pacific (1991) 230 Cal. App.3d 480, 281 Cal.Rptr. 396 (Korean United)[1] and Guardian Angel Polish National *849 Catholic Church v. Grotnik (2004) 118 Cal.App.4th 919, 13 Cal.Rptr.3d 552 (Guardian Angel) the Court of Appeal applied the "neutral principles" approach to reach a result identical with what the traditional "principle of government" approach would have required, i.e., upholding the property claim of a general church. On the other hand, in California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church (2004) 121 Cal.App.4th 754, 17 Cal. Rptr. 3d 442 (California-Nevada), the court reached an opposite result (and also acknowledged that it could not be reconciled with Guardian Angel).
This case is also about statutory construction. In 1982, that is  after the consistent Baker-Wheelock line and after Church of Palm Springs and Barker  the Legislature, by passing Senate Bill 1178 (1981-1982 Reg. Sess.), added subdivisions (c) and (d) to Corporations Code section 9142[2] involving trusts on property held by religious corporations.
An examination of the history of Senate Bill 1178 shows that the Legislature had no intention of overturning or even changing the Baker-Wheelock line, or codifying Barker or Church of Palm Springs, as the California-Nevada court would later surmise. Rather, the expressed intent of the Legislature was to "fill a void" (the phrase consistently found in the legislative history) created by earlier legislation, Senate Bill 1493 (1979-1980 Reg. Sess.) in 1981, which, while it had stripped the California Attorney General of the ability to enforce trusts against religious corporations, left no one else with the ability to enforce such trusts.
In fact, an examination of the plain language of (then newly-added) subdivisions (c) and (d) to section 9142 shows a consistency with the Baker-Wheelock line, as long as (to use the statutory phrases) a "general church" has a "governing instrument" that "expressly" provides for a trust against the property of a local church corporation which is a "member" of that general church.
Since, in the case before us, the general church does have a governing instrument so providing an express trust on the property of local parish corporations who are members of the general church, we are, in this opinion, spared the issue of any arguable conflict between the Baker-Wheelock line and the statute. (This issue might arise in a case where, say, a hierarchically organized church did not have a governing instrument "expressly" declaring a trust, but where it asserted such a trust some other way). In this case, the common law rule of the former and the plain language of the latter dovetail to require the same result.
And finally, this case is about anti-SLAPP motions.[3] In procedural terms, part of this appeal arises out of a dismissal, pursuant to an anti-SLAPP motion, of a lawsuit brought by the diocese of a general church against a disaffiliating local church corporation that had been a member of the general church. It is now well-established in California that anti-SLAPP motions are tested by a two-prong process, in which the court must first look at (1) whether the motion even qualifies for anti-SLAPP treatment, and (2) the merits. Readers by this point will have already grasped that the trial court erred as to (2). But we also explain that it erred as to (1) as well.
In a word, the lawsuit brought by the plaintiff general church is a property dispute *850  basically over who controls a particular church building in Newport Beach  and does not arise out of some desire on the part of the general church to litigate the free exercise rights of the local congregation. They are free to disaffiliate just so long as they do not try to take the parish property with them. Readers will look in vain in this opinion for any indication of what religious controversy may have prompted the disaffiliation. We may easily reach the merits of the case under both the "principle of government" standard of the Baker-Wheelock line, and the plain language of section 9142, without ever needing to mention the reason for the defendants' disaffiliation. That controversy is irrelevant to this action.

II. FACTS AND BACKGROUND
St. James Parish in Newport Beach began as a "mission" of the Episcopal Church in 1947. In requesting permission to upgrade the parish's status from a "mission" to a full-fledged church, the founding members promised to be bound under the "Ecclesiastical authority of the Bishop of Los Angeles, and his successors in office, the Constitution and Canons of the Church now known as the Protestant Episcopal Church in the United States of America."
As a full-fledged church, it was incorporated in 1949. The articles of incorporation expressed this purpose: "To establish and maintain a Parish which shall form a constituent part of the Diocese of Los Angeles in that branch of the Holy Catholic Church now known as the Protestant Episcopal Church in the United States of America."
Under the canons of the Los Angeles Diocese of the Episcopal Church, each parish elects a board of directors known as the "vestry" for the local corporation.
In 1958, the canons of the Los Angeles Diocese also provided that all property held by each parish would revert back to the Diocese upon dissolution of the parish.
In 1979, the Episcopal Church enacted Canon 1.7(4), which provides that "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located."
In 2004, the board of St. James Parish voted to cease all affiliation with the Episcopal Church. They amended the articles of incorporation to delete all references to the Episcopal Church. A majority of the congregation voted to support the decision, but a minority of 12 members voted against it. The Los Angeles Diocese appointed a new rector and requested that the board surrender the parish property. The board refused.
The Bishop of the Los Angeles Diocese, together with at least one of the 12 members voting against disaffiliation (Rasmussen), then filed this lawsuit in Orange County Superior Court against the rector leading the disaffiliation (Bunyan) and members of the board, alleging eight property-recovery-related causes of action. Also, the national Episcopal Church successfully sought leave to intervene in the case, and filed its own complaint in intervention.
To be sure, the original and first amended complaint and complaint in intervention in this case have included a great deal of what in story writing is known as "local color," that might make the case seem as if it arose from a particular theological controversy. However, one could blue pencil all of that background detail out of the complaints and they would still stand on their own: The Diocese claims that the property is held in trust for it, the national church supports the claim, and the local church rejects it.
*851 After a first-amended complaint the defendants soon brought an anti-SLAPP motion to dismiss the case, which was granted. In the wake of the successful anti-SLAPP motion brought against the diocese's action, the court also sustained a demurrer to the national church's (by then amended) complaint in intervention. Appeals from both dismissals followed, which this court has consolidated on its own motion.

III. THE FIRST ANTI-SLAPP PRONG
It is remarkable that the diocesan complaint in this case should come to this intermediate appellate court on a dismissal from an anti-SLAPP motion, as distinct from, say, a motion for summary judgment or trial. It seems safe to say that church property disputes are not the typical anti-SLAPP case. We are thus required to deal with the propriety of treating the diocesan complaint as a SLAPP suit before we address the merits of the property dispute (which we would be required to do in any event in the context of reviewing the propriety of the sustained demurrer to the national church's complaint in intervention).
The first prong in anti-SLAPP analysis is to determine "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (Navellier v. Sletten (2002) 29 Cal.4th 82, 88, 124 Cal. Rptr.2d 530, 52 P.3d 703.)
The theory behind the local church's prosecution of an anti-SLAPP motion is that the local church is, in essence, the object of litigation (the "strategic lawsuit" part of an anti-SLAPP motion) because of its theological differences with the diocese (and by extension, the national general church). The flaw in this thinking that it confuses the motivation for the disaffiliation with the claims made by the general church about the use of church property.
As the diocese points out in its briefing, it makes no difference why the defendants are disaffiliating, the point is they are being sued for asserting control over the local parish property to the exclusion of a right to control asserted by the plaintiffs. The fact that a religious controversy may have prompted the dispute over the right to control the property does not mean the defendants are being sued for the "protected activity" of changing their religion.
To illustrate: Suppose a married couple owning a house as community property were to split up because the husband suddenly decided to change religions. Would the wife's ensuing petition for dissolution be a "SLAPP" suit because her claims to her community share of the house could be traced to her displeasure with her husband's new-found religion? Hardly.
Or, to use another example, (this one based on an example from the diocese's appellants' brief): What if this case had arisen because the board of the local church had wanted to sell the property to a warehouse department store and, for all we know, donate the proceeds to the general church? Surely the issue of who actually controlled the parish property could still be asserted in a normal civil suit  in our hypothetical, for example, the diocese or national church might prefer the parish property in its traditional use as distinct from the money from the sale, and still assert whatever legal or equitable rights it might have in favor of that traditional use.
Prong one is measured by whether "protected activity" is the "gravamen or principal thrust" of the complaint. (Martinez v. Metabolife Internal., Inc. (2003) 113 Cal.App.4th 181, 193, 6 Cal.Rptr.3d 494.) This complaint could stand alone as *852 a simple dispute over who controls certain real property, and hence does not implicate any protected activity on the part of the local church. The trial court therefore erred in concluding that the first prong was satisfied.

IV. THE SECOND ANTI-SLAPP PRONG AND THE MERITS OF THE COMPLAINT IN INTERVENTION
If the trial court had not erred on the first prong in finding that the plaintiffs' lawsuit qualified for anti-SLAPP treatment, it presumably would have stopped there and denied the motion. It would not then have proceeded to the second prong and determined that plaintiffs' lawsuit was susceptible to dismissal on the merits.
We cannot stop with prong one, however. The propriety of the sustaining of the demurrer to the national church's complaint in intervention depends solely upon the merits of the case. We now turn to the relevant authorities that govern the issue of disputes over church property in California. We will examine them in chronological order.

A. The Law, Pre-Watson

The law prior to the 1871 decision of the United States Supreme Court in Watson, supra, 80 U.S. 679 is of more than "academic interest in this case, because the 1969 decision of the United States Supreme Court in Hull Church, and the 1981 decision of the intermediate California Court of Appeal in Barker would both be, in part, animated by a rejection of that law.
To be more specific, early 1800's decisions over church property in England developed an "implied trust" theory, which is usually attributed to then Chancellor, Lord Eldon. (See Note, Judicial Intervention in Disputes Over the Use of Church Property (1962) 75 Harv. L.Rev. 1142, 1145-1146.) Lord Eldon's implied trust theory required the court to decide the "nature of the original institution and the standard of faith it represented." (Id. at p. 1146.) The idea behind Lord Eldon's implied trust theory sought to most closely approximate the disposition of the property with the original intent of the donor: "Since the identity or character of a church was, he felt, embodied in the doctrines and usages believed and practiced by its founders, to allow a body of worshippers to change its doctrine and yet retain control of its property would be tantamount to allowing a trust for the benefit of A to be diverted to B." (Ibid.)
Lord Eldon's implied trust theory would be later described by the Hull Church court as a "departure-from-doctrine" approach. (Hull Church, supra, 393 U.S. at p. 443, fn. 2, 449-450, 89 S.Ct. 601.)
Its flaw was pretty obvious: Given the First Amendment and the establishment clause, requiring civil courts to divine what was the "true" original doctrine of a given religion and then determine whether some development represented a departure from that true doctrine was simply untenable. Which brings us to Watson.

B. Watson

The United States Supreme Court was able to weigh in on the issue in Watson, a case arising out of a split in a Louisville, Kentucky, Presbyterian Church over slavery during the Civil War. Title to the property was held in the name of the trustees of the local church, and the general Presbyterian Church had recently required ministers in southern states to publicly oppose slavery. A pro-slavery minority, however, elected their own trustees and physically seized control of the property. When members of the antislavery faction sued, the Kentucky state court reasoned that the public anti-slavery *853 opposition required of southern ministers was contrary to a provision in the constitution of the Presbyterian Church prohibiting intermeddling in civil affairs. The case eventually made its way to the United States Supreme Court based on diversity jurisdiction.
The court classified religious property disputes into three categories: (1) Where the property is held in express trust. (2) Where the property is held by a "religious congregation" that is "independent," owing "no fealty or obligation to any higher authority." And (3) Where the property is held by a "religious congregation or ecclesiastical body" which is a "subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization." (Watson, supra, 80 U.S. at p. 722.)
The Watson court then articulated and applied what may accurately be called the "principle of government" or "highest judicatory]" rule for disputes. (See Watson, supra, 80 U.S. at pp. 725-727.) In a passage that would be quoted numerous times later, including by the California State Supreme Court, the Watson court said: "In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property." (Ibid., italics added.)
By contrast, in a hierarchically organized church such as the one involved in the case before it (the court had just enumerated the various levels of organization in the Presbyterian Church) the Watson court said: "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (Watson, supra, 80 U.S. at p. 726, italics added.)
Because reference to the "highest ... judicatories" of the church at issue in Watson proved the dispositive rule, the Watson approach is often seen as synonymous with the "hierarchy theory." (See Barker, supra, 115 Cal.App.3d at pp. 611-613, 171 Cal.Rptr. 541.)
But we hasten to add that the "hierarchy" description is a technical misnomer. As the passage just quoted about majority rule shows, Watson's "principle of government" is in point of fact neutral toward any kind of church organization. It simply makes the decision turn upon the structure of governmental organization in a church, as distinct from some other criterion.
The Watson court also made very clear that its "highest judicator[y]" approach was "otherwise" from Lord Eldon's implied trust approach. (Watson, supra, 80 U.S. at p. 727.) But that was to be expected given the First Amendment. The court said in America people are free to "organize voluntary religious associations" and "It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals *854 as the organism itself provides for." (Id. at pp. 727-729.)
At the time of the Watson decision, the federal First Amendment had not been made binding on the states, so the Watson decision could not make law for the entire country (a point that will become important when we get to the Hull Church case decided about 100 years later). However, its persuasive force clearly influenced the common law of California, as articulated by the California Supreme Court, to whose decisions we now turn.

C. The California Supreme Court Cases

1. Baker
Just because a majority of a local congregation changes beliefs doesn't mean the property can change in use: That is the lesson of Baker, supra, 79 Cal. 365, 21 P. 764.
In Baker, a congregation of the Reformed Church incorporated as the First Reformed Church of the City Stockton. The articles of incorporation of the new church included a direct reference to the "Heidelberg Catechism." (Baker, supra, 79 Cal. at p. 373, 21 P. 764.)
The corporation owned some land used as a parsonage. By the late 1880's, however, it appears that the majority of the members of the congregation had gone over to the Lutheran persuasion. (Baker, supra, 79 Cal. at p. 374, 21 P. 764 ["the defendants, even though they constituted a majority of the members"].) So the corporation's trustees changed the name of the corporation to the German Lutheran Zion Society, and used the parsonage for Lutheran ministers.
The remnant Reformed Church members sued to recover the property and the California Supreme Court affirmed a judgment in their favor. The court noted that the church property was originally dedicated to the use of the Reformed Church, that it was held in trust by the corporation's trustees, and the trustees had no power to change its original purpose. "It is thus made clear that the property in question was held by the Reformed Church in trust for its members, and the defendants, even though they constituted a majority of the members, had no right and no power to divert it to the use of another and different church organization." (Id. at p. 374, 21 P. 764.) That is, there was no ipso facto doctrine of majority rule, or of corporate qua corporate control.

2. Wheelock
While Baker had only adumbrated the idea that local congregations who were members of a general church could not necessarily claim control of local church property based on title being in a local church corporation. The point would become explicit in Wheelock, supra, 119 Cal. 477, 51 P. 841, which fully embraced Watson's principle of government approach.
There, a dispute arose in the First Presbyterian Church of Los Angeles, which had been incorporated, as to where to spend the proceeds from a real estate sale  location A or location B. The corporation's trustees followed the majority of the congregation and wanted location A. The supporters of location B took their case to a church tribunal within the Presbyterian Church  one that the Supreme Court in its opinion would acknowledge as having "control and supervision of the Presbyterian Churches of the city of Los Angeles." (Wheelock, supra, 119 Cal. at p. 479, 51 P. 841.) The church tribunal partially sided with the supporters of location B, and ordered the First Presbyterian Church of Los Angeles split into two churches, with an equitable division of the fund by a commission. (The commission chose to apportion the money based on membership numbers.)
*855 The supporters of location A didn't like the result, and refused to pay over any money. The supporters of location B went to court for their share under the tribunal's ruling, on the theory that they were enforcing a trust against the First Presbyterian Church of Los Angeles in favor of the new church at location B. They lost on demurrer and their appeal reached the state supreme court.
The Supreme Court began with the premise that civil courts had ultimate authority over the division of the money: "It may be conceded, for the' purposes of the case, that neither the Presbytery nor the commission appointed by it had the power to divide and apportion the money held by the church corporation; and that the disposition of those moneys were matters for civil courts, and that ecclesiastical decrees bearing upon such disposition are not binding upon judicial tribunals." (Wheelock, supra, 119 Cal. at p. 482, 51 P. 841.)
But then the high court immediately shifted gears, and noted that the decrees of the internal church tribunal were binding on the incorporated First Presbyterian Church of Los Angeles "as an ecclesiastical body": "But the ecclesiastical court known as the Presbytery had the power to deal with the First Presbyterian Church in all matters ecclesiastical. The church as an ecclesiastical body was under the absolute control and dominion of the Presbytery, and the decisions and decrees of that body were as binding upon it as the decisions and decrees of this court are binding upon inferior judicial tribunals." (Wheelock, supra, 119 Cal. at p. 482, 51 P. 841.)
Then came the punch line, in which the court explicitly used a principle of government approach: "Those decrees are not only binding upon the church as an ecclesiastical body, but they are binding and conclusive upon courts wherever and whenever material to pending litigation." (Wheelock, supra, 119 Cal. at p. 482, 51 P. 841, italics added.)
That meant that the courts had to follow the rulings of the church tribunal as to the use of the property, even if supporters of location A  who, we must remind readers, controlled the corporation  didn't like its ruling. (Wheelock, supra, 119 Cal. at p. 482, 51 P. 841.) "It is apparent that many members were grieved at such results and deemed the treatment harsh, but all must bow to the law, and ecclesiastical law equally with civil law is binding in its own domain." (Ibid.)
Significantly, in Wheelock the California Supreme Court was indifferent to the fate of the First Presbyterian Church of Los Angeles qua corporation. Inherent in following the church tribunal's decree the high court distinguished the corporation from the "church proper": "The spiritual or ecclesiastical body being dissolved, what becomes of the money held by the corporation? This question brings before us the consideration of the status of the corporation as relating to the church proper. The Civil Code of this state (original section 595) expressly permits religious bodies to incorporate, but such incorporation is only permitted as a convenience to assist in the conduct of the temporalities of the church. Notwithstanding incorporation the ecclesiastical body is still all important. The corporation is a subordinate factor in the life and purposes of the church proper. A religious corporation like the one at bar, under the laws of this state, is something peculiar to itself. Its function and object is to stand in the capacity of an agent holding the title to the property, with power to manage and control the same in accordance with the interest of the spiritual ends of the church." (Wheelock, supra, 119 Cal. at pp. 482-183. 51 P. 841, italics added.)
Later in the opinion the court returned to that distinction: "It is insisted that the *856 First Presbyterian Church being incorporated the fact of incorporation stands as a lion in the path absolutely prohibiting any application of the doctrine of a pro rata division of the property. It is declared that the action of the Presbytery in dissolving the church ... would result in an absolute dissolution of the corporation, and it is contended that a corporation under the laws of this state cannot be dissolved in that way. The trial court took this view of the case, and upon this ground sustained a general demurrer to the complaint.... But the solution of this contention does not appear to be material. A corporation composed simply of the trustees, or of all the members, is still a body separate and distinct from the church proper ...." (Wheelock, supra, 119 Cal. at pp. 485-486, 51 P. 841.)
The decision ended by rejecting the view of a Michigan court, expressed in Wilson v. Livingstone (1894) 99 Mich. 594, 58 N.W. 646, which had adhered to a simple majority-rule rationale independent of the principle of government in the Presbyterian Church: "The Michigan case especially declares that a majority of the members may control the property of the corporation, and practically that the title of the property of the corporation follows the majority wherever it may lead and however often and radical a change of faith overtakes it. In this state we take the other view." (Wheelock, supra, 119 Cal. at p. 487, 51 P. 841.)
Our Supreme Court had then only to note that the supporters of location B had a kind of consolation prize. Since they had not seceded from the Presbyterian Church, they were beneficiaries of the trust as much as the supporters of location A. (Wheelock, supra, 119 Cal. at p. 483, 51 P. 841.)
Further expounding on the problem of corporate ownership qua corporate ownership the court, in a series of quotes from other courts, included one from Indiana based on the locus of authority test: "It is declared by the supreme court of Indiana that `the title to the property of a divided church is in that part of the organization which is acting in harmony with its own law.'" (Wheelock, supra, 119 Cal. at p. 485, 51 P. 841, italics added, quoting White Lick, etc. v. White Lick, etc. (1883) 89 Ind. 136.)

3. Horsman
The United States Supreme Court in Watson had clearly wanted civil courts to be able to resolve church property disputes without becoming mired in religious controversy and so deferred to the internal government of whatever church happened to be involved. Horsman, supra, 129 Cal. 131, 61 P. 796 is, in fact, a vindication of that approach, demonstrating how the principle of government approach allows secular courts to deftly avoid entangling themselves in theological matters.
In 1841 the Church of the United Brethren in Christ had organized itself into a general conference and adopted a constitution. Forty-eight years later, in 1889, at the general conference, the church adopted a new constitution. But it wasn't unanimous  the vote was 110 to 20. The 110 became known as the "liberals" while the 20 were the "radicals." (Horsman, supra, 129 Cal. at p. 134, 61 P. 796.)
In Tulare County, however, most of the members (75 out of 80) sided with the radicals. The radicals sued to recover two tracts of land given the church about 10 years prior to the 1889 split, and then occupied by the liberals. (See Horsman, supra, 129 Cal. at pp. 134-135, 61 P. 796.)
Horsman began, like Watson, with the same three-category topology of religious property disputes: "The courts are in no way concerned with the transactions of *857 ecclesiastical bodies except in so far as tangible rights of person or property are affected. Questions relating to these are divided by the court into three classes: The first is where property, by the express terms of the grant, `is devoted to the teaching, support, or spread of some specific form of religious doctrine or belief; the second, where it is held by or in trust for an independent congregation; and the third, where it is held by or in trust for a congregation or other association subordinate to some general church organization." (Horsman, supra, 129 Cal. at p. 136, 61 P. 796.)
However, in framing the issue before the court, the Horsman opinion used a phrase that we will venture to opine was, in retrospect, not the most felicitous: "true church." It said, "The sole question, therefore, is as to the identity of the church. If the radical is the true church, the plaintiffs are entitled to recover; otherwise not." (Horsman, supra, 129 Cal. at p. 135, 61 P. 796.) When Horsman was decided T.S. Eliot had not yet written his famous parody of the "true church" in his poem "The Hippopotamus"[4] so the court was probably not as attuned to the dangers of wandering in the "miasmal mist" searching for the "true church" as later courts would be.
That said, it is clear from Horsman that our high court was not engaged in figuring out who was theologically correct in the dispute between the liberals and the radicals within the Church of the United Brethren in Christ. The liberals won, because the principle of government in the Church of the United Brethren in Christ was that the decisions of the General Conference were authoritative, and the General Conference had sided with the liberals.
The split in the Church of the United Brethren in Christ had generated litigation all over the country, including Michigan (see Bear v. Heasley (1893) 98 Mich. 279, 57 N.W. 270,) where the Michigan Supreme Court had held in favor of the radicals on the theory that the general conference of 1889 failed to observe the requirements of the constitution adopted by the general conference in 1841. The California Supreme Court used the Michigan decision as a foil, taking the opportunity to articulate a principle of government view. The general conference was to be "`the highest legislative body ... in the church'" and our high court analogized the general conference of the church, in its powers, to the British Parliament. (Horsman, supra, 129 Cal. at p. 140, 61 P. 796.) In the process, the Horsman court expressly adopted the principle of government views propounded by dissenting Judge Grant in the Michigan case. (See Horsman, supra, 129 Cal. at pp. 137-138, 61 P. 796.)[5]

*858 4. Committee of Missions
Committee of Missions, supra, 157 Cal. 105, 106 P. 395 represents a fairly lengthy exploration by our Supreme Court into the mechanics of the church government of a group known as the as Pacific Synod of the Cumberland Presbyterian Church. The opinion relates that the Cumberland Presbyterians broke off from the Presbyterian Church in the United States of America because the Cumberland group disagreed with predestinarian aspects of the Westminster Confession. (Id. at pp. 110-112, 106 P. 395.)[6]
However, in 1900, the U.S.A. Presbyterians repudiated the "offensive doctrines contained in the Westminster confession" (Committee of Missions, supra, 157 Cal. at p. 113, 106 P. 395.), and that led to a movement to unify the Cumberland and U.S.A. churches. A unification did indeed take place in 1906, which was challenged by dissenters in the Cumberland group. Those dissenters decided that there were "vacancies" in the board of trustees of the corporation that owned the Cumberland church property (the official name was the "Permanent Committee of Missions of the Pacific Synod of the Cumberland Presbyterian Church in the United States"), and purported to elect their own slate. Then, in the name of the corporation, they sued the U.S.A. church to deliver the Cumberland church's property over to them. They lost at trial and the Supreme Court affirmed in a detailed exposition of the internal church government of the Cumberland church  the point of which was that the unification had been duly approved by the highest governing authority of the Cumberland church, quoting Watson's "highest of the church judicatories to which the matter has been carried" language. (Committee of Missions, supra, 157 Cal. at pp. 128-129,106 P. 395, quoting Watson, supra, 80 U.S. at p. 727.)
Indeed, in parallel with Watson, the California Supreme Court emphasized that the rule of looking to the highest church authority "although not accepted in England" was "the prevailing rule in this country." (Committee of Missions, supra, 157 Cal. at p. 128, 106 P. 395.) Thus it made no difference that the unification hadn't been put to a vote of the membership (id, at p. 122-123, 106 P. 395), or that the litigation involved donations made to the Cumberland church as such (id, at p. 126-127, 106 P. 395).

5. Rosicrucian Fellowship
Rosicrucian Fellowship, supra, 39 Cal.2d 121, 245 P.2d 481, is not a case readily susceptible to a reader-friendly retelling of its basic facts. Suffice to say, though, that one point comes through loud and clear: In the tradition of Wheelock, the high court did not operate under a rule that corporate ownership was the end of all inquiries as to rights to church property (in that case, the property was called "Mt. Ecclesia").
The case involved a religious organization that didn't have any organized form of church government  not hierarchical, not congregational, not any. (See Rosicrucian Fellowship, supra, 39 Cal.2d at p. 128, 245 P.2d 481 ["The judgment ... declared ... that the church has no ecclesiastical organization or system of church government:..."] and p. 133, 245 P.2d *859 481 [noting plaintiffs' argument that the Rosicrucians were an "anomalous class" because it fit none of the three forms of church government (hierarchical, assembly or congregational) ].)
Indeed, one of the arguments in the Rosicrucian Fellowship case was that in a religion that has no church government, by necessity the fact that a religious corporation owns title to property trumps any rights in mere followers of the church. The high court clearly rejected that point: (See Rosicrucian Fellowship, supra, 39 Cal.2d at p. 134, 245 P.2d 481 ["It appears that from the first, the unorganized church and its members through its leaders, the Heindels, have exercised property and civil rights incident to ecclesiastical functions which were not surrendered to plaintiff corporation."].) Rather, our Supreme Court affirmed a judgment declaring that the corporation was a trustee for an "unincorporated church [which] was the basic group and owned most of the rights" to the property. (Id. at p. 135, 245 P.2d 481.)

6. Providence Baptist
The problem of governance in the context of a congregationally organized church was confronted by our high court in Providence Baptist, supra, 40 Cal.2d 55, 251 P.2d 10. A Baptist pastor had incorporated a Baptist church in 1945, with a board of three trustees (himself and two others). One day in 1950, the two other trustees adopted a resolution removing him and the next day at a meeting of members of the congregation adopted the same resolution. The incorporated church and its trustees sued the pastor to get back certain funds and records. The trial court issued a decision that the trustees were entitled to those funds and records. However, it also concluded that neither the trustees nor the pastor could hold a fair election about removing him from office, and so appointed a referee to conduct an election among all the members after due notice. The pastor petitioned for writ relief on the theory that the court was intruding into ecclesiastical matters; his writ was denied in a published opinion.
The Providence Baptist court specifically noted that the church "is the congregational type in which its affairs are controlled by the members." (Providence Baptist, supra, 40 Cal.2d at p. 61, 251 P.2d 10.) Hence there was "no tribunal but the congregation" to which the court might look, and, in that context, a civil court could indeed determine "whether the meeting at which a pastor was removed was properly conducted according to the usage, contracts and rules of the society" insofar as the civil and property rights involved with the pastor's office were involved. (Id. at pp. 61-62, 251 P.2d 10.)
As in all the previous cases (save maybe Rosicrucian Fellowship, the point of which was that corporate form was not dispositive), the California Supreme Court centered its decision on the proper locus of ecclesiastical authority  in its phrase "the appropriate body of the church." It was that body that would make the decision. (Providence Baptist, supra, 40 Cal.2d at p. 63, 251 P.2d 10 ["While we may not be dealing with the officer of a corporation in the strict sense (the pastor of a church is involved) the situation is similar and we see no reason why an election cannot be conducted where, as appears, a fair and proper election cannot be conducted by the church and the election previously held was irregular and of no effect. In other words the appropriate body of the church is assisted in acting within its proper sphere, according to its rules and regulations, to protect civil and property rights."].) Such an activity was, of course, different from determining whether the pastor was "preaching a theology contrary to the denominational doctrine." (Ibid.)

*860 D. The United States Supreme Court Cases in the Decade Prior to Church of Palm Springs
As we shall see when we come to Church of Palm Springs, supra, 89 Cal. App.3d 910, 152 Cal.Rptr. 854, that court read four United States Supreme Court cases of the previous decade as requiring that states use a four-factor approach that would come to be called "neutral principles analysis." We now turn to the question of whether any of those cases really did so.

1. Hull Church
Hull Church arose out of a secession of local Presbyterian Churches from the general Presbyterian Church, specifically involving two congregations in Georgia. Readers will recall that Watson was decided as a diversity case, so it did not announce a nationwide rule. Thus, it was possible, even by the late 1960's, for a state like Georgia to still be using Lord Eldon's implied trust theory in which a major component was whether a religious organization had "departed from the tenets of faith and practice it held at the time the local churches affiliated with it." (Hull Church, supra, 393 U.S. at p. 441, 89 S.Ct. 601.) And in the opinion United States Supreme Court expressly linked Georgia's approach with the English implied-trust-departure-from-doctrine theory. (See id. p. 443, fn. 2, 89 S.Ct. 601 [saying that the Georgia theory "derives from principles fashioned by English courts" and citing the English opinions articulating those principles].)
Right from the beginning, the Hull Church court formulated the issue in terms of whether Georgia's implied-trust-departure-from-doctrine theory offended the First Amendment: "Under Georgia law the right to the property previously used by the local churches was made to turn on a civil court jury decision as to whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it. The question presented is whether the restraints of the First Amendment, as applied to the States through the Fourteenth Amendment, permit a civil court to award church property on the basis of the interpretation and significance the civil court assigns to aspects of church doctrine." (Hull Church, supra, 393 U.S. at p. 441, 89 S.Ct. 601.) In two sentences the federal high court had pinpointed the entanglement inherent in the implied trust doctrine. So, of course, the answer was no  the First Amendment did not permit the entanglement with religious controversy inherent in Georgia's "departure-from-doctrine" approach.
The court devoted the next three paragraphs to quickly describing the litigation, the third of which returned to the theme that Georgia law required civil courts to determine departures from church doctrine. (See Hull Church, supra, 393 U.S. at pp. 443-444, 89 S.Ct. 601 ["the jury was instructed to determine whether the actions of the general church `amount to a fundamental or substantial abandonment of the original tenets and doctrines of the (general church), so that the new tenets and doctrines are utterly variant from the purposes for which the (general church) was founded'"].)
Having set up the issue for resolution, the court next turned to prior U.S. Supreme Court case law. The body of the opinion was then taken up with discussions of a prior quartet of federal high court cases, all of which had adhered to Watson's principle of government approach: Watson itself, then Gonzalez v. Roman Catholic Archbishop of Manila (1929) 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (Gonzalez); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America (1952) 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. *861 120 (Kedroff); and finally Kreshik v. St. Nicholas Cathedral (1960) 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (Kreshik ).
As the descriptions of all four cases by the Hull Church opinion indicated, the court agreed with the approach of those cases:
  It pointed out that language from Watson left "the civil courts no role in determining ecclesiastical questions in the process of resolving property disputes." (Hull Church, supra, 393 U.S. at p. 447, 89 S.Ct. 601, original italics.)
  It quoted with apparent approval Justice Brandeis's point in Gonzalez that "`In the absence of fraud, collusion or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.'" (Hull Church, supra, 393 U.S. at p. 447, 89 S.Ct. 601.)
  It also noted that the decision of the church in Moscow in a "Moscow-based" church was binding on North American churches in Kedroff. (Hull Church, supra, 393 U.S. at pp. 447-448, 89 S.Ct. 601).
  And it further noted that in Kreshik the federal supreme court had held that a legislature could not transfer control of a cathedral to churches away from the "central governing authority of the Russian Orthodox Church." (Hull Church, supra, 393 U.S. at pp. 448-449, 89 S.Ct. 601.)
Having finished its canvass of prior authority, the Hull Church court then wrote a passage that would later become the main prooftext in the Church of Palm Springs opinion justifying a change to "neutral principles." Here is that passage: "The Georgia courts have violated the command of the First Amendment. The departure-from-doctrine element of the implied trust theory which they applied requires the civil judiciary to determine whether actions of the general church constitute such a `substantial departure' from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated." (Hull Church, supra, 393 U.S. at pp. 449-450, 89 S.Ct. 601.)
When read in context, however, the point of that paragraph was consistent with its main point of the Hull Church opinion: Use of the implied trust doctrine with its departure-from-doctrine element jeopardized "First Amendment values" by making property "turn on the resolution by civil courts of controversies over religious doctrine and practice." (Hull Church, supra, 393 U.S. at p. 449, 89 S.Ct. 601.) That paragraph was clearly not intended to suggest that the principle of government approach offended First Amendment values, as shown by what had come just before  an approving discussion of four decisions all of which had used the principle of government approach.
The rest of the paragraph and the next one were elaborations on the theme that the Georgia implied trust doctrine required civil courts to decide religious controversies, but  and this is significant  the Hull Church court went out of its way to distinguish the Gonzalez decision from the Hull Church's condemnation of civil courts adjudicating religious doctrine. Gonzalez was a case where a will directed that a family member be appointed to a chaplaincy in the Roman Catholic Church, as if the governing authorities of that church had nothing to say in the matter. The trial court entered an order requiring the appointment. The United States Supreme Court affirmed a judgment of the Supreme Court of the Philippines reversing the trial court's upending of the proper ecclesiastical chain of command. (See *862 Hull Church, supra, 393 U.S. at p. 447, 89 S.Ct. 601.) The Hull Church court acknowledged that Gonzalez involved a "marginal civil court review of ecclesiastical determinations" (Hull Church, supra, 393 U.S. at p. 447, 89 S.Ct. 601), an acknowledgement that is understandable given that Justice Brandeis left the door open in Gonzalez for civil court determinations of whether ecclesiastical determinations involved "fraud, collusion or arbitrariness." The court said, though, that the Gonzalez opinion had not erred even under the Hull Church court repudiation of the Georgia implied trust doctrine, in language that once again emphasized Watson's principle of government approach:
"Since the Georgia courts on remand may undertake to determine whether petitioner [the general church] is entitled to relief on its cross-claims, we find it appropriate to remark that the departure-from-doctrine element of Georgia's implied trust theory can play no role in any future judicial proceedings. The departure-from-doctrine approach is not susceptible of the marginal judicial involvement contemplated in Gonzalez. Gonzalez' rights under a will turned on a church decision, the Archbishop's, as to church law, the qualifications for the chaplaincy. It was the archbishopric, not the civil courts, which had the task of analyzing and interpreting church law in order to determine the validity of Gonzalez' claim to a chaplaincy. Thus, the civil courts could adjudicate the rights under the will without interpreting or weighing church doctrine but simply by engaging in the narrowest kind of review of a specific church decision  i.e., whether that decision resulted from fraud, collusion or arbitrariness. Such review does not inject the civil courts into substantive ecclesiastical matters." (Hull Church, supra, 393 U.S. at pp. 450-451, 89 S.Ct. 601, all italics added.) And with that distinguishment of Gonzalez, the Hull Church court reversed the judgment of the Georgia Supreme Court.
However, Justice Harlan, in concurrence, wanted to make a point about express trusts, that had not been issue in Hull Church: While he agreed with the majority that Georgia's departure-from-doctrine doctrine meant unconstitutional entanglement with religion because it forced "civilian courts to weigh the significance and the meaning of disputed religious doctrine," he saw nothing wrong with civilian courts enforcing express trusts. The example he gave was one where a donor "expressly gives his church some money on the condition that the church never ordain a woman as a minister or elder" or "never amend certain specified articles of the Confession of Faith" then "the church should not be permitted to keep the property simply because church authorities" have approved the "doctrinal innovation." (Hull Church, supra, 393 U.S. at p. 452, 89 S.Ct. 601 (cone. opn. of Harlan, J.)). We will meet the spirit of Justice Harlan's concurrence again when we discuss section 9142. But for the moment we now turn to the second of the four U.S. Supreme Court cases preceding Church of Palm Springs.

2. Eldership
The Eldership case had reached the U.S. Supreme Court's docket prior to the Hull Church case, and had been remanded for consideration in light of Hull Church. (Eldership, supra, 396 U.S. at p. 367, fn. 2, 90 S.Ct. 499.) It was, literally, a one-paragraph per curiam opinion dismissing an appeal "for want of a substantial federal question" because, on remand, the state court had gotten it right and not offended First Amendment principles by using a departure-from-doctrine approach. (Id, at p. 367, 90 S.Ct. 499.)
*863 Specifically, on remand, the Maryland intermediate appellate court had "relied upon" four general sources, described only in the most general terms by the Eldership court: (1) state statutes; (2) language in deeds conveying the properties; (3) terms of charters of the corporations; and (4) provisions in the church's constitution pertinent to the ownership and control of church property. (Eldership, supra, 396 U.S. at p. 367, 90 S.Ct. 499.) Since the matter had been resolved in the state courts without "inquiry into religious doctrine," there was a "want of a substantial federal question" and the appellants' appeal was dismissed. And that was all the Eldership opinion said. (Eldership, supra, 396 U.S. at p. 368, 90 S.Ct. 499.)
However, there was a three-justice concurring opinion written by Justice Brennan who had authored the opinion for the court in Hull Church. Justice Brennan's concurring opinion was obviously intended to provide helpful guidance to state legislatures and courts. (See generally Eldership, supra, 396 U.S. at p. 368, 90 S.Ct. 499 (cone. opn. of Brennan, J.).)
Structurally, the concurring opinion was straightforward: There were three permissible ways for states to adjudicate church property disputes, even though in Hull Church the high court had said that departure-from-doctrine was not permissible:
(1) The principle of government: "Thus the States may adopt the approach of Watson v. Jones ... and enforce the property decisions made ... within a church of hierarchical polity by the highest authority that has ruled on the dispute at issue...." (Eldership, supra, 396 U.S. at pp. 368-369, 90 S.Ct. 499 (cone. opn. of Brennan, J.))
(2) Neutral principles: "`[N]eutral principles of law, developed for use in all property disputes,' [citation] provide another means for resolving litigation over religious property." (Eldership, supra, 396 U.S. at p. 370, 90 S.Ct. 499 (cone. opn. of Brennan, J.), italics added.)
(3) Special Statutes: "A third possible approach is the passage of special statutes governing church property arrangements in a manner that precludes state interference in doctrine." (Eldership, supra, 396 U.S. at p. 370, 90 S.Ct. 499 (cone. opn. of Brennan, J.))
But, with perfect parallel structure, for every permissible method, the three-justice concurring opinion in Eldership had a caveat:
(1) For the principle of government, the three justices cautioned that if the question of the identity of the governing body is itself a matter of "substantial controversy," then "civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy." (Eldership, supra, 396 U.S. at pp. 369-370, 90 S.Ct. 499 (cone. opn. of Brennan, J.).) We note that the question of identity qua identity of the governing body was not being made off-limits, only reference to "religious law and usage" to make the determination.
(2) For the neutral-principles-formal title approach, the warning was that "general principles of property law may not be relied upon if their application requires civil courts to decide doctrinal issues." (Eldership, supra. 396 U.S. at p. 370, 90 S.Ct. 499 (cone. opn. of Brennan, J.).)
(3) Finally, the statutory approach had to be "carefully drawn to leave control of ecclesiastical polity, as well as doctrine, to church governing bodies," (Eldership, supra, 396 U.S. at p. 370, 90 S.Ct. 499 (cone, opn. of Brennan, J.)), a formulation that obviously contemplated some deference to "ecclesiastical polity."
Also, in addressing Watson's principle of government approach, it is worth noting that the three-justice concurring opinion in *864 Eldership added a footnote to address the issue of express trusts that had been the subject of Justice Harlan's separate concurrence in Hull Church: Express trusts could not be "enforced if enforcement is constitutionally impermissible under [Hull Church]." And then the three justices added: "Any language in Watson, supra, at 722-723, that may be read to the contrary must be disapproved. Only express conditions that may be effected without consideration of doctrine are civilly enforceable." (Eldership, supra, 396 U.S. at p. 369, fn. 2, 90 S.Ct. 499 (cone. opn. of Brennan, J.)) (That last bit by a minority of three justices purporting to disapprove a previous majority opinion was unusual for a concurring opinion. The last we checked, three justices on a nine-justice court cannot, in a separate concurring opinion, disapprove of language in a previous majority opinion, but since the issue doesn't arise in the case before us  even the three justices in the Eldership concurrence recognized the legitimacy of the principle of government approach  we need not go any further into the matter.)
Watson's approach (and by extension, California's Baker-Wheelock line), had easily survived Eldership. That approach would actually be specifically reapproved in the next case.

3. Serbian Orthodox
If the three judges who had concurred in Eldership had any thought of rejecting Watson's principle of government approach, it was clearly dispelled in the Serbian Eastern Orthodox case, where Justice Brennan, this time writing for the majority, wrote a ringing affirmation of the Watson highest judicatory tribunal rule, quoting large swaths of the Watson opinion with gusto, including its "`right to establish tribunals ... among themselves'" language that we have already quoted above. (See Serbian Eastern Orthodox, supra, 426 U.S. at pp. 710-711, 96 S.Ct. 2372.)
To the degree that Serbian Eastern Orthodox represented any departure at all from previous United States Supreme Court case law, it was in the direction of squeezing out that little bit of wriggle room that Justice Brandeis had left when he wrote an introductory clause in Gonzalez using the words "In the absence of fraud, collusion, or arbitrariness...." (Serbian Eastern Orthodox, supra, 426 U.S. at p. 711, 96 S.Ct. 2372.)
That is, Serbian Eastern Orthodox was all about whether there was an arbitrariness exception to the principle of government approach. If there had been one before based on language in Gonzalez, there weren't any more after the Serbian Eastern Orthodox court got through with it. The highest tribunal in the Serbian Orthodox Church  and there was no question on the point  had demoted, then defrocked, a particular bishop. The Illinois state Supreme Court, however, had determined that the bishop's removal had been "`arbitrary'" (see Serbian Eastern Orthodox, supra, 426 U.S. at pp. 708, 718, 426 U.S. 696) because (quoting Serbian Eastern Orthodox quoting the Illinois Supreme Court) "`a detailed review of the evidence discloses that the proceedings resulting in [the bishop's] removal and defrockment were not in accordance with the prescribed procedure of the constitution and the penal code of Serbian Orthodox Church.'" (Serbian Eastern Orthodox, supra, 426 U.S. at p. 718, 96 S.Ct. 2372.)
That review conducted by a state was beyond the pale  the Supreme Court was quite clear that the civil courts were not to play amateur canon lawyers and second-guess the decisions of a church's highest tribunal. In effect, the Illinois Supreme Court had impermissibly engaged in a "judicial rewriting of church law." (Serbian Eastern Orthodox, supra, 426 U.S. at p. 719, 96 S.Ct. 2372; see also id. at pp. 712-713, *865 96 S.Ct. 2372 ["The conclusion of the Illinois Supreme Court that the decisions of the Mother Church were `arbitrary' was grounded upon an inquiry that persuaded the Illinois Supreme Court that the Mother Church had not followed its own laws and procedures in arriving at those decisions."].)
We need only note further that the Serbian Eastern Orthodox opinion, besides invoking  not rejecting  the Watson principle of government or highest tribunal approach, contains a number of passages which unmistakably approve of looking to a church's organizational hierarchy as a principle for settling church property disputes, and in fact indicate that for states to ignore hierarchy creates First Amendment problems of its own: "For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." (Serbian Eastern Orthodox, supra, 426 U.S. at p. 709, 96 S.Ct. 2372, italics added.)
And further, "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them" (Serbian Eastern Orthodox, supra, 426 U.S. at pp. 724-725, 96 S.Ct. 2372, italics added.)
The two separate opinions from Serbian Eastern Orthodox should also be noted, since those opinions foretold future nuances to be developed in the last of the four cases, Jones. Chief Justice Burger (joined by Justice White) wrote a one-paragraph concurrence to make the point that whether a church was hierarchically organized was still a matter for the civil courts'"ultimate decision." (Serbian Eastern Orthodox, supra, 426 U.S. at p. 725, 96 S.Ct. 2372 (cone. opn. of C.J. Burger).)
And Justice Rehnquist (joined by Justice Stevens) dissented in the name of state's rights defending the Illinois state court approach. He also mixed in a little skepticism about the Watson rule, or at least the exception for arbitrariness that Justice Brandeis had inserted into it in Gonzalez, in this rhetorical flourish: "If the civil courts are to be bound by any sheet of parchment bearing the ecclesiastical seal and purporting to be a decree of a church court, they can easily be converted into handmaidens of arbitrary lawlessness." (Serbian Eastern Orthodox, supra, 426 U.S. at p. 727, 96 S.Ct. 2372 (dis. opn. of Rehnquist, J.).)

4. Jones
The final movement in the quartet played before the Church of Palm Springs case came by way of Jones v. Wolf (1979) 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775, which might be styled the sequel to Hull Church. As we have seen, less than 10 years before Georgia had been using Lord Elton's implied trust theory, that theory had failed constitutional scrutiny in Hull Church, and the state had been forced to develop an alternative approach. The approach chosen by the Georgia courts was described by Jones as a "neutral-principles analysis." (Jones, supra, 443 U.S. at p. 601, 99 S.Ct. 3020.) (The evolution of Georgia law after Hull Church was *866 traced in Jones v. Wolf, supra, 443 U.S. at pp. 599-601, 99 S.Ct. 3020.)
Under the neutral principles analysis used by the Georgia courts, the numerical majority of a particular Presbyterian congregation had voted to secede from the general church (the split was 164 to go, 94 to stay), and the Georgia courts, finding no basis for an implied trust in state statutes, the corporate charter of the local church, or even in the Presbyterian Book of Church Order, held that "legal title to the property of the [local] Vineville church was vested in the local congregation," and further held "[w]ithout further analysis or elaboration," the local congregation was represented by the majority faction. (Jones, supra, 443 U.S. at p. 601, 99 S.Ct. 3020.)
The central problem before the federal high court in Jones was whether Georgia's relatively recent conversion to neutral principles analysis was permissible under the First Amendment. One must remember: Up to Jones, a majority of the United States Supreme Court had never clearly okayed neutral principles analysis. The closest it had come was that one-paragraph dismissal of an appeal from the Maryland state courts in Eldership.
Interestingly though (interesting in that it helps explain the nature of the issue that the court was tackling in Jones) the four dissenters did not include either Justice Rehnquist or Justice Stevens, who had favored a states' rights position in their dissent in Serbian Eastern Orthodox. This time they stood in the five-justice majority, which is precisely what one would expect given the states' right issue that was before the Jones court.
The split in the court was over whether the Watson highest tribunal approach was, in fact, mandated on the state law as a matter of First Amendment law (the dissenters' position) or whether a state had the option, consistent with the First Amendment, of adopting the neutral principles approach. (See Jones, supra, 443 U.S. at p. 605, 99 S.Ct. 3020 (maj. opn.) ["We cannot agree, however, that the First Amendment requires the States to adopt a rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved."].)
Yes, said the majority. And they perceived that the neutral principles approach has some things going for it: "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." (Jones, supra, 443 U.S. at p. 603, 99 S.Ct. 3020.) That meant states were "constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." (Id. at p. 604, 99 S.Ct. 3020.)
The Jones majority also appears to have been aware of an obvious problem with the fact of a transition from a highest tribunal approach to neutral principles analysis: Neutral principles analysis makes a church property dispute issue turn on the quality of legal drafting done years prior to the dispute, and drafting done in a different legal environment.
And so the majority added this  well, it's not quite dicta because the point is to bolster the permissibility of using neutral principles analysis, but, strictly speaking, it does involve speculation involving permutations of the approach the court was approving  language to round out its opinion: "Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time *867 before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church." (Jones, supra, 443 U.S. at p. 606, 99 S.Ct. 3020, italics added.)
Still, the case wasn't over  the majority was not willing to merely affirm the result in the Georgia courts. That is, Georgia neutral principles might declare the property to be controlled by the local congregation, but that still left the question of exactly who was the "true representative" of that congregation? (See Jones, supra, 443 U.S. at p. 607, 99 S.Ct. 3020 ["Petitioners earnestly submit that the question of which faction is the true representative of the Vineville church is an ecclesiastical question that cannot be answered by a civil court."].)
The Georgia courts, however, hadn't dealt with that problem. So the Jones majority assured them that a presumption of majority rule would be permissible under the First Amendment (Jones, supra, 443 U.S. at pp. 607-608, 99 S.Ct. 3020), but also noted that there were strains in Georgia law that might allow courts to ascertain the true representatives of the local congregation based upon a civil court's analysis of the Presbyterian Church's Book of Church Order, and that analysis was definitely impermissible given that the hierarchical Presbyterian Church had already made that decision in favor of the minority. (See Jones, supra, 443 U.S. at p. 609, 99 S.Ct. 3020 ["All this may suggest that the identity of the `Vineville Presbyterian Church' named in the deeds must be determined according to terms of the Book of Church Order, which sets out the laws and regulations of churches affiliated with PCUS. Such a determination, however, would appear to require a civil court to pass on questions of religious doctrine, and to usurp the function of the commission appointed by the Presbytery, which already has determined that petitioners represent the `true congregation' of the Vineville church."].)
That worry dovetailed with an earlier concern expressed in the majority opinion (in the context of talking about the advantages of neutral principles analysis) that even neutral principles analysis might require civil courts to resolve religious controversies. If that happened, then the principle of government rule was required as a matter of constitutional law: "The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." (Jones, supra, 443 U.S. at p. 604, 99 S.Ct. 3020, italics added.)

E. The California Intermediate Appellate Court Cases Breaking With the State Supreme Court Cases
As it turns out, Church of Palm Springs and, ultimately, Barker, were preceded by *868 two other decisions of the intermediate appellate court which paved the way for the break. We include those two decisions, In re Metropolitan Baptist Church of Richmond, Inc. (1975) 48 Cal.App.3d 850, 121 Cal.Rptr. 899 (Metropolitan Baptist ) and Wilson v. Hinkle (1977) 67 Cal. App.3d 506, 136 Cal.Rptr. 731 (Wilson) because, after those four cases, California's common law regarding church property disputes appeared dramatically different from what it had been since our state's highest court had decided Providence Baptist.

1. Metropolitan Baptist
The very first California case to use the phrase "neutral principles" in any sort of church context was Metropolitan Baptist, supra, 48 Cal.App.3d 850, 121 Cal.Rptr. 899.. That fact turns out to be extremely ironic, because Metropolitan Baptist is probably the closest California case we have, or will review in this opinion, to employing a version of Lord Eldon's implied trust approach. And in fact the court actually inquired into the nature of the teachings of particular churches to make its decision. To be specific, the Metropolitan Baptist court actually ended up ascertaining whether two Northern California Baptist churches were "fundamental" Baptist churches  as distinct from, presumably, wow-fundamental Baptist churches. (See id. at p. 856, 121 Cal.Rptr. 899.)
There was a Baptist Church in Richmond, California whose membership, by 1970, shrank to six members, and three of those were the pastor, his wife, and his adult son. So all six members voted to dissolve the church corporation, and liquidate and distribute the corporation's assets, consisting of about $25,000. The six members wanted to split the assets one-third to a Dublin Baptist church, one-third to an Iowan Baptist Church, one-sixth to a Serviceman's Center in Long Beach, one-twelfth to an Oakland Baptist church, and one-twelfth to a Baptist seminary. (Metropolitan Baptist, supra, 48 Cal.App.3d at pp. 853-854,121 Cal.Rptr. 899.)
The Attorney General, however, became involved in the case (indeed, he was the respondent on appeal) and advocated a distribution more in keeping with the original intent of the incorporators (one of whom intervened in the case). The original articles of incorporation stated that the purpose was to form a Baptist church in Richmond, and extrinsic evidence was allowed in by the trial court that the founders also wanted that church to be "in essential accord with the beliefs of fundamental Baptist churches." (Metropolitan Baptist, supra, 48 Cal.App.3d at p. 855, 121 Cal.Rptr. 899.) Several of the proposed distributees obviously did not qualify, such as the seminary and the Serviceman's Center.
The trial court used an approach of trying to approximate the intent of the incorporators: The assets were intended to go to "fundamental" Baptist churches in Richmond, and, since there were no such "fundamental" Baptist churches in Richmond, the next best thing was to split them between the two geographically closest "fundamental" Baptist churches, the one in Oakland and the one in Dublin. (See Metropolitan Baptist, supra, 48 Cal.App.3d at pp. 855-856, 121 Cal.Rptr. 899.) The six-member Richmond Baptist church appealed.
In affirming, the Metropolitan Baptist court devoted almost no attention to the problem that it had chosen the recipients of the assets based on a religious test  whether they were "fundamental" or not, and certainly did not discuss the implications of a court being forced to make such a selection. The whole issue was taken care of in two paragraphs with no citation to any authority: "Our first inquiry is *869 whether the superior court's determination, that the Church's purpose was to teach and preach the Scriptures, as a church in Richmond, Contra Costa County, in essential accord with the beliefs of fundamental Baptist churches, was supported by substantial evidence." (Metropolitan Baptist, supra, 48 Cal.App.3d at p. 856, 121 Cal.Rptr. 899.)
That was one paragraph, setting up the issue. It was followed by a second paragraph merely saying that substantial evidence supported the trial court's conclusion, and which did not give any details. (It probably would have been productive if it had  the very act of writing up why the Oakland and Dublin churches qualified as "fundamental" Baptist churches might have alerted the Metropolitan Baptist court that it was wandering in the miasmal mist searching for a "true" "fundamental" Baptist church.)
Next, however, came the main issue, which was in response to the assertion, raised by the remnant of the appellant Richmond church, that the court should follow the decision of the congregation, i.e., use the principle of government rule that Watson and the Baker-Wheelock line of California Supreme Court had used, though the Metropolitan Baptist did not give any indication that the principle of government rule was the product of Supreme Court decisions. (Metropolitan Baptist, supra, 48 Cal.App.3d at p. 856, 121 Cal.Rptr. 899.)
That point was refuted by the Metropolitan Baptist court in an analysis that went this way: Because the Richmond church was organized as a nonprofit religious corporation, it therefore "follow[ed]" that it held its property in trust "`to carry out the objects for which the organization was created.'" (Metropolitan Baptist, supra, 48 Cal.App.3d at p. 857, 121 Cal.Rptr. 899, quoting Lynch v. Spilman (1967) 67 Cal.2d 251, 260, 62 Cal.Rptr. 12, 431 P.2d 636. (Lynch) was a case involving a trust to establish a boys' or youth club.) Hence, the distribution was proper under the cy pres doctrine as carrying out "original trust purposes ... as nearly as possible." (Metropolitan Baptist, supra, 48 Cal. App.3d at pp. 857-858, 121 Cal.Rptr. 899.)
It was in that context  that is, of justifying the application of cy pres to the liquidation of a congregationally organized church  that the Metropolitan Baptist court made statements that resolution of church property disputes "may sometimes touch upon ecclesiastical concepts," but then juxtaposed the comment against the development of neutral principles. ("To resolve the often delicate question of the First Amendment's application to disputes concerning church property, a principle of state `neutrality' has developed. This concept has been described as the application of `neutral principles of law, developed for use in all property disputes, which can be applied' without establishing `religion....'" (Metropolitan Baptist, supra, 48 Cal.App.3d at pp. 858-859, 121 Cal. Rptr. 899, quoting Hull Church, supra, 393 U.S. at p. 449, 89 S.Ct. 601.))
The court did not address how the cy pres doctrine  to be sure, a traditional and neutral principle of trust law in non-religion cases  interacted with the need of courts to stay away from religious disputes, or differed from Lord Eldon's discredited implied trust doctrine when applied to church property disputes. Nor did the court mention, much less address, the line of California Supreme Court cases that adhered to a governmental principle approach. That lacuna is particularly conspicuous given that the Richmond Church had invoked it in order to justify their (not its, their  it was a congregationally organized church, remember) proposed distribution. (See Metropolitan Church, supra, 48 Cal.App.3d at p. 856, 121 Cal.Rptr. 899 *870 [noting contention that the congregation's proposed distribution was an "`ecclesiastical decision binding and conclusive upon the court'" albeit "`under the doctrine of separation of church and state'" as distinct from prior California precedent].)

2. Wilson
The next case on the road to Barker was Wilson, supra, 67 Cal.App.3d 506, 136 Cal. Rptr. 731. Strictly speaking, Wilson was not a property dispute case, except to the degree that a purely religious argument about whether a minister who otherwise would have control over church facilities implicated a property dispute. It was framed and written as a jurisdiction case.
In Wilson, there was a "former minister" of what appears from the facts as stated by the court to be local congregation (with church property) that was part of the "Unity Movement" and a "present minister" of the same congregation. The former minister and his followers sued the present minister for quiet title and return of the church property on the ground that the present minister had strayed from the (unnamed in the opinion) tenets of the Unity Movement. (See Wilson, supra, 67 Cal.App.3d at pp. 508-509, 136 Cal.Rptr. 731.)
Judging from the opinion, the doctrinal straying was the only ground for the suit. There is no assertion by the former minister that, for example, the Unity Movement was a hierarchical religious organization and that its highest church adjudicatory had removed the present minister from his post.
Thus, anyone at all familiar with the repudiation by the federal high court in Watson of Lord Eldon's implied trust theory would know the case was doomed. It was thus no surprise that the Wilson court affirmed a judgment after demurrer to the complaint based on lack of jurisdiction. (See Wilson, supra, 67 Cal.App.3d at pp. 509-512, 136 Cal.Rptr. 731.) Wilson involved precisely the kind of religious controversy framed in the guise of a church property dispute that Watson had tried to avoid.
However, the Wilson court also swept (or, to be precise, tried to sweep) from the field several cases from the Baker-Wheelock line on the theory that Hull Church had implicitly overruled it. First it opened a paragraph with this broad declaration: "The California cases cited by appellants are either inapposite or have been implicitly overruled by Hull, supra, and Serbian Eastern Orthodox Diocese v. Milivojevich (1976) 426 U.S. 696 [no pinpoint page cite, parallel citations omitted]." (Wilson, supra, 67 Cal.App.3d at p. 511, 136 Cal.Rptr. 731.) Alas, the Wilson court did not specify which "California cases" it was talking about, or why it thought they had been overruled.
Next followed a paragraph explaining that that a civil court could "accept jurisdiction" where ecclesiastical questions were only incidentally involved, thus distinguishing the recently decided cases of St. James Armenian Church of Los Angeles v. Kurkjian (1975) 47 Cal.App.3d 547, 121 Cal.Rptr. 214[7] and Metropolitan Baptist, which we have just discussed. The paragraph, however, ended with these words: "However, we do note that the California Supreme Court cases cited in In re Metropolitan Baptist Church of Richmond, Inc., supra, especially Rosicrucian *871 Fellow., supra, 39 Cal.2d at p. 131, 245 P.2d 481  or at least some of the language therein  is governed and changed by Hull. (See also Providence Baptist Church v. Superior Ct, supra, 40 Cal.2d at p. 63, 251 P.2d 10.)"
The Wilson court did not elaborate, and it is not clear which precise "California Supreme Court cases" cited in Metropolitan Baptist the Wilson court was referring to. The Metropolitan Baptist court had cited Rosicrucian Fellowship, supra, 39 Cal.2d at pp. 131-132, 245 P.2d 481, and Horsman, supra, 129 Cal. at page 138, 61 P. 796, for the proposition that matters involving "creeds" "considerations of faith" and even "general polity" were "[e]cclesiastical matters" and then immediately cited Hull Church and the same page 131, 245 P.2d 481, of Rosicrucian Fellowship (plus two appellate opinions) for the proposition that "In such matters the state, and its courts, have no legitimate concern or jurisdiction." (Metropolitan Baptist, supra, 48 Cal.App.3d at p. 858, 121 Cal.Rptr. 899.)
The only other California Supreme Court decision mentioned in Metropolitan Baptist (besides two non-religious charitable trust cases mentioned on page 860, 121 Cal.Rptr. 899 of the opinion) was Providence Baptist, cited for the proposition  apparently one with which the Wilson court agreed  that courts may accept jurisdiction over property disputes when any "ecclesiastical questions" are only "indirectly involved." (Metropolitan Baptist Church, supra, 48 Cal.App.3d at p. 859, 121 Cal.Rptr. 899.)

3. Church of Palm Springs
A little bit of ground work having been laid, Church of Palm Springs, supra 89 Cal.App.3d 910, 152 Cal.Rptr. 854 (also sometimes referred to as "Presbytery of Riverside") struck off in a clearly different direction than the one used by the state Supreme Court in the Baker-Wheelock line of cases.
Preliminarily, we should note that it is an interesting legal question of whether Church of Palm Springs might have reached the result it did  affirming a trial court decision to let a local church have control over the property as against the claims of a hierarchical denomination  by following the rule of stare decisis and applying the principle of government rule from Watson and the Baker-Wheelock line. Years later, another panel of the intermediate appellate court, in Guardian Angel, would elegantly (elegant at least in the mathematical sense, and perhaps the stylist sense, but readers can judge that for themselves), distinguish Church of Palm Springs by noting that the local church in that case had had an independent existence prior to affiliating with a larger denomination, thus one might be able to say the substantive authority in the local church always was the local congregation: "In that case [Palm Springs], the local church had been known for a number of years as the Community Church of Palm Springs, having no hierarchical affiliation. The church later affiliated with the Presbyterian Church, although it quickly discontinued the use of `Presbyterian' in its name, reverting to `Community Church of Palm Springs.' Moreover, throughout its history, the church had extended membership to all Protestant denominations. The church described itself as interdenominational and nondenominational." (Guardian Angel, supra, 118 Cal.App.4th at p. 929, 13 Cal.Rptr.3d 552, citing Palm Springs, supra, 89 Cal.App.3d at pp. 916-917, 152 Cal.Rptr. 854.)
In other words, as Guardian Angel would see Church of Palm Springs, the congregation was the original source of governing authority, and it never relinquished *872 that authority upon affiliating with the larger denomination.
While the case might be so distinguished, the fact remains that the Church of Palm Springs opinion proceeded on the premise that the "neutral-principles" approach that had been approved for use in state courts in Jones was now mandatory and not just optional.
Church of Palm Springs involved a local community church that had been affiliated with the United Presbyterian Church in the United States of America (a national church). The national church was hierarchical, in "ascending representational levels of ecclesiastical authority" (Church of Palm Springs, supra, 89 Cal.App.3d at p. 915, 152 Cal.Rptr. 854.) In 1967, disputes arose over unspecified "several doctrinal changes" and "a mandate for social action" adopted by the national church's general assembly; the disputes could not be resolved, and the members of the community church "voted to withdraw from the general church." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 917-918, 152 Cal. Rptr. 854.)
Interestingly, the local church did not directly secede from the general denomination: In a manner reminiscent of the doctrine of exhaustion of administrative remedies, it presented a petition to 181st General Assembly of the general church to "withdraw with its property." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 918, 152 Cal.Rptr. 854.) However, the administrative route was never completed, in the court's phrase, "its request was never considered or decided on the merits" because the matter was referred to a committee that determined the petition had been "`filed by an independent body which has renounced the jurisdiction of the United Presbyterian Church'" and therefore, "`cannot be considered.'" (Id. at p. 919, 152 Cal.Rptr. 854.) In subsequent litigation the trial court determined that the local church was the owner of the property.
It was the ambiguity of the internal proceedings that was the very first reason given by the Church of Palm Springs court for rejecting a disposition of the property in favor of the national church: "In the first place, there is a serious question whether the issue of ownership of the disputed property was ever finally determined on its merits by the judicatories of UPCUSA." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 919, 152 Cal.Rptr. 854.)
The court's second reason occupied most of the long opinion. The court began by acknowledging the truth of the proposition that decisions of the highest church judicatories must be accepted by civil courts as "`final, and as binding on them.'" (Palm Springs, supra, 89 Cal.App.3d at p. 919, 152 Cal.Rptr. 854, quoting Watson, supra, 80 U.S. 679, 727.) But, said the Church of Palm Springs court, that rule was expressly qualified (not repealed) by the more recently announced rule that civil courts must adjudicate the property dispute "without attempting to resolve the underlying ecclesiastical controversy." (Church of Palm Springs, supra, 89 Cal. App.3d at p. 920, 152 Cal.Rptr. 854.)
The Church of Palm Springs court then found particularly salient a passage from Hull Church, supra, 393 U.S. at page 449, 89 S.Ct. 601 against the involvement of civil courts in religious controversy. As we have noted in this opinion, that passage did not mandate "neutral principles" as distinct from principle of government. (Read carefully, the passage said that the formal title doctrine was one way of avoiding entanglement in religious controversies; the only hard and fast rule was that civil court must not resolve disputes over church property in a way that requires *873 them to resolve "`controversies over religious doctrine.'")
Here are" the salient parts of the passage from Hull Church quoted by Church of Palm Springs. The emphasis is ours: "`[T]he first amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.... [T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.'" (Palm Springs, supra, 89 Cal.App.3d at p. 920-921, 152 Cal.Rptr. 854, quoting Hull Church, supra, 393 U.S. at p. 449, 89 S.Ct. 601, italics added by us, ellipses and brackets chosen by Church of Palm Springs court.)
After the long passage from Hull Church, the Church of Palm Springs case addressed the Serbian Eastern Orthodox opinion, which, as we have seen, used the Watson rule. The court recognized that the Serbian Eastern Orthodox opinion "held the decisions of the ecclesiastical tribunals final and conclusive." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 921, 152 Cal.Rptr. 854.) And that makes sense, given that the primary focus in Serbian Eastern Orthodox was on the right to ecclesiastical office, as distinct from control of church property.
But then the court took a turn that is harder to understand. After the passage dealing with Serbian Eastern Orthodox case, the Church of Palm Springs court read Watson the great dispositive enunciation of the organizational theory, as having really, and improperly, intruded into ecclesiastical doctrine. (See Church of Palm Springs, supra, 89 Cal.App.3d at p. 921, 152 Cal.Rptr. 854.) Speaking of the Watson case, here is the passage from Church of Palm, Springs, omitting parallel citations, and with our italics: "However, again contrary to appellants' arguments, the decision in Watson v. Jones even in its pristine state did not preclude civil courts from adjudicating church disputes that are essentially property disputes only incidentally involving or arising out of ecclesiastical disputes. In Watson v. Jones the court was asked to decree the termination of an implied trust because of alleged departures from doctrine by the general church. (See Presbyterian Church v. Hull Church, supra, 393 U.S. at p. 445) Thus the dispute involved in the case was purely ecclesiastical. The court would have been required to determine what the orthodox doctrine was, what changes in doctrine had been made, and whether such changes as were found constituted such substantial or fundamental departures from the orthodox doctrine as to constitute a violation of the trust. (See Presbyterian Church v. Hull Church, supra, 393 U.S. at pp. 449-450 Thus the court was called upon `to determine *874 matters' at the very core of a religion  the interpretation of particular church doctrines and the importance of those doctrines to the religion.)" (Palm Springs, supra, 89 Cal.App.3d at pp. 921-922,152 Cal.Rptr. 854, italics added.)
Now, that is a most novel reading of Watson, given that Watson had tried to get civil courts away from implied trust theory and toward a principle that would recognize "no heresy." (See Watson, supra, 80 U.S. at p. 728 ["The law knows no heresy, and is committed to the support of no dogma...."].) And it does not do justice to the deference shown Watson by the United States Supreme Court in not only Serbian Eastern Orthodox, but in Hull Church, the concurring opinion in Eldership, and even in Jones. Indeed, it appears that Church of Palm Springs was using Hull Church to retroactively recast Watson solely as an ecclesiastical office case and not what it was  a property dispute case. The Church of Palm Springs court also provided no original source citations from Watson for its idea that Watson was wading in to matters "at the very core of ... particular church doctrines."
After the passage on Watson, the court next turned its attention to three of the main California Supreme Court cases, Committee of Missions, Horsman, and Wheelock, making the point that the first two (Committee of Missions and Horsman) involved "clearly ecclesiastical" disputes. (Palm Springs, supra, 89 Cal. App.3d at p. 922, 152 Cal.Rptr. 854.) It appears that the Church of Palm Springs court was trying to convey the idea that Committee of Missions and Horsman were bad law in light of Hull Church. That interpretation is supported by the next passage, dealing with Wheelock.
Wheelock, according to the Palm Springs court, applied "general principles of trust law and concluded that the fund of money should be apportioned on the same basis as that suggested by the presbytery and its commission" and therefore it had followed "`neutral principles of law.'" (Church of Palm Springs, supra, 89 Cal. App.3d at p. 923,152 Cal.Rptr. 854.)
With the absolute greatest respect for the panel in Church of Palm Springs, we must conclude that its reading of Wheelock (as well as its summary dismissals of Committee of Missions and Horsman) was incorrect. As we have seen (and we have quoted the appropriate passages from Wheelock), the Wheelock court was applying the Watson principle of government to a dispute over a particular fund: Because the appropriate governing authorities had apportioned the fund in a certain way, the civil courts had to respect that apportionment.
From there the Church of Palm Springs court turned its attention to the case before it, recognizing that the property dispute "arose out of an underlying controversy involving largely questions of religious doctrine." (Palm Springs, supra, 89 Cal.App.3d at p. 923, 152 Cal. Rptr. 854.) Juxtaposing the religious origins of the dispute against the resolution of the dispute by the civil courts, the Church of Palm Springs court enunciated four propositions: "However, the dispute to be decided by the court in this case is essentially a property dispute; the only relationship between the religious controversy and the dispute in the case at bench is that the latter arose out of the former; the property dispute may be resolved without the necessity of becoming involved with or attempting to resolve the underlying ecclesiastical controversy; and the trial court acted with the propriety in determining the case on the basis of `neutral principles of law" and `formal title' doctrine." (Palm Springs, supra, 89 Cal. App.3d at p. 923, 152 Cal.Rptr. 854.)
*875 The first three of those propositions seem correct, even if one uses the principle of government rule from Wheelock. The fourth proposition  that the trial court acted correctly in deciding the case based on neutral principles and "`formal title' "  does not follow under the rule of stare decisis. Whatever other merits the approach might have had, it was not the common law of California as articulated by our Supreme Court.
Things became curiouser as the court rounded the bend and came to the top of page 924, 152 Cal.Rptr. 854 in the official reporter, which is the part of the opinion which undertook to rebut the loser's arguments. At this point, the court noted that the general church was trying to "analogize" its, case to the "Serbian Orthodox, Horsman, and Wheelock cases." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 924,152 Cal.Rptr. 854.)
Well, yes, obviously. In each of those high court cases, the civil court had looked at the organizational structure of the church involved to determine the property dispute. If that rule were to be applied to the facts in Church of Palm Springs, the general church might  and the "might" rather than a "would" is important  win.
The Church of Palm Springs court then characterized the three cases this way: "As already indicated, the controlling questions in those cases turned on disputes directly involving religious doctrine or church polity, organization or structure." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 924, 152 Cal.Rptr. 854, italics added.)
Again, With all respect for the Church of Palm Springs panel, that statement was not correct. None of those cases "turned" on "religious doctrine" as such, except insofar as organizational structure is seen to be itself a matter of religious doctrine. We note, though, that there is only one case in our entire survey of the case law in the area where organizational structure was an actual matter of controversy. (Concord Christian Center v. Open Bible Standard Churches (2005) 132 Cal.App.4th 1396, 34 Cal.Rptr.3d 412 (Concord Christian ).) And in that case the appellate court easily surmounted the issue without involvement in religious dogma, but that case is getting ahead of ourselves. In any event, it appears that the Church of Palm Springs court was conflating religious controversy with "polity, organization or structure."
From this one might expect the coup de grace to be administered: The Church of Palm Springs court would flat out repudiate the principle of government as a guiding principle for civil courts, look to title, note that title was in the hands of the local church corporation, and affirm the judgment. But no. Mid-paragraph, the Church of Palm Springs court changed direction, and instead of repudiating the principle of government, embraced it in a kind of odd way, engaging in the sort of lengthy exploration of internal church structure that the California Supreme Court had undertaken in Committee of Missions. That is, the Church of Palm Springs court devoted the latter half of page 924, 152 Cal.Rptr. 854 to making the point that, organizationally, the departure of the local church had been accepted  practically ratified  by the general church. (See ibid. ["When Presbytery acted on June 8, 1968, to suspend the powers of the Community Church session effective June 30, 1968, Community Church had already terminated its relationship with UPCUSA and withdrawn from the Presbyterian denomination. It is undisputed that a local church within UPCUSA may withdraw and terminate its affiliation. ... Community Church has renounced its affiliation with the Presbyterian denomination and does not claim to be a Presbyterian church.... Community Church ended that *876 controversy when it withdrew from UPCUSA and terminated its relationship with the Presbyterian denomination.]" (Palm Springs, supra, 89 Cal.App.3d at p. 924, 152 Cal.Rptr. 854.))
In short, the Palm Springs case was not being decided by simple title, but by the sort of technical twist on the loser's position that would have made Shakespeare's Portia proud: In effect, the Palm Springs court said to the general church: Oh, so you want this case decided by your own organizational rules, do you? Well fine. Under your own rules a local church may withdraw, and you are therefore stuck with that result.
At this point in the opinion (beginning with page 925, 152 Cal.Rptr. 854), the organization of the Church of Palm Springs opinion again changes gears (the opinion is written without any subheadings), with the court going into the mode of batting down various arguments raised by the appellants, i.e., the general church.
First was an argument that a judgment for the local church would infringe on the general church's free exercise rights. (Church of Palm Springs, supra, 89 Cal. App.3d at p. 925, 152 Cal.Rptr. 854.) That one was easy, the court simply needed to allude to the various U.S. Supreme Court cases that said it was all right to resolve "property disputes involving religious organizations so long as that resolution does not depend on the court's attempting to resolve ecclesiastical controversies." (Ibid.)
Then came the argument that a "hierarchical structure" meant "as a matter of law," that local church property was to be "held in trust for the general church." (Church of Palm Springs, supra, 89 Cal. App.3d at p. 925, 152 Cal.Rptr. 854.) The court waded into the Wheelock case and announced that the Wheelock rule "in fact supports the position of Community Church." (Id. at p. 926, 152 Cal.Rptr. 854.) The court referenced the language in Wheelock that had noted that the members of both churches that had split by the higher level of organization "`were beneficiaries of the trust before the Presbytery divided the church and in justice and equity must stand in the same position after division.'" (Palm Springs, supra, 89 Cal. App.3d at p. 926, 152 Cal.Rptr. 854.) Hence, according to the Palm Springs court, "In essence what the [Wheelock] court was saying was that the directors or trustees of the corporation hold title to the property of the church in trust for the local church and every member thereof." (Ibid.) And then later, "Thus, properly read, Wheelock stands for the proposition that the property of a local church, even one that is part of a general church organization of hierarchical structure, is held in trust by the religious nonprofit corporation for the benefit of the local church congregation." (Palm Springs, supra, 89 Cal. App.3d at p. 927,152 Cal.Rptr. 854.)
Again, with respect to the Church of Palm Springs court, we must disagree with its reading of Wheelock. The Church of Palm Springs court confused the principle by which the tribunal of a hierarchical church had itself decided to apportion the fund in Wheelock with the rule of decision used by the court in deciding the Wheelock case. The rule of decision of the court in Wheelock was deference to the Presbyterian tribunal, not the (radical) idea that, as a matter of law, a local congregation of a hierarchically-structured church necessarily holds local property in trust for members of the congregation.
Next the Church of Palm Springs opinion addressed language in Committee of Missions, then Horsman, then Watson itself, all involving holding property in trust. This section of the Church of Palm Springs opinion is not the clearest in the opinion (there seems to be a kind of partial *877 dialog with the appellant's briefs), but it appears that the main point is that none of those cases had embraced a "trust theory" of hierarchical structure. And of course that point was thoroughly correct, since, as the Church of Palm Springs court itself recognized, Watson had indeed broken with the implied trust theory that had dominated resolution of disputes since the early 1800's, and which had represented the British rule. Here is the passage: "Moreover, the effect of Watson v. Jones was the rejection or repudiation of the very doctrine that appellants appear to invoke  the implied trust doctrine holding that church property was the subject of an implied trust in favor of those who adhered to the faith of the founders of the church." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 928, 152 Cal.Rptr. 854, italics added.)
Obviously there was some confusion, either in the briefs or by the Church of Palm Springs court, between Lord Eldon's discredited implied trust theory and the principle of government approach that Watson had used to replace it.
Indeed, there is a good case to be made that the confusion was the product of poor briefing by the appellant general church. Apparently the general church there had advanced a tedious argument contending for an implied trust "with their contentions based on the First Amendment and the Serbian Eastern Orthodox and Watson v. Jones decisions"  so much so that it was "difficult to organize" those arguments "for meaningful discussion." (Church of Palm Springs, supra, 89 Cal.App.3d at p. 929, 152 Cal.Rptr. 854.)

4. Barker
In a moment, the decision in Church of Palm Springs had reversed about a hundred years of state and federal Supreme Court precedent, and disturbed what had been a stable legal universe in California involving the methodology by which California state courts would decide church property disputes. It had recast Wheelock for as standing for the principle of majority rule, and consigned Horsman Watson and Serbian Eastern Orthodox to the bin of cases solely confined to religious controversies qua religious controversy.
The next intermediate appellate decision regarding church property, Barker, built on the Church of Palm Springs foundation, but expressly did not examine it: It was prepared to accept the "comprehensive analysis" contained in Church of Springs at face value. (See Barker, supra, 115 Cal.App.3d at p. 614, 171 Cal.Rptr. 541 ["We next turn to California law to determine what legal principles California courts employ to resolve disputes over church property. Fortunately, we have the benefit of the comprehensive analysis of the problem in the court's opinion written by Justice Kaufman in" Church of Palm Springs].) That is, the Barker court flat out rejected the principle of government approach (which it called "Hierarchical Theory") because the Church of Palm Springs "opinion places California law squarely in the neutral-principles camp." (Barker, supra, 115 Cal.App.3d at p. 614, 171 Cal.Rptr. 541.)
The Baker court next rejected implied trust theory, but that was easy to do since the four U.S. Supreme Court cases preceding Church of Palm Springs had done so. (See Barker, supra, 115 Cal.App.3d at pp. 615-620, 171 Cal.Rptr. 541 [ending with observation that the difficulties of the theory "remain insurmountable"].)
The Barker court reached its result by plying the four-factor neutral principles approach, which it considered "Express Trust" theory. (See Barker, supra, 115 Cal.App.3d at p. 620-624, 171 Cal.Rptr. 541.) Applying the four factors, the Barker court held that three of four disaffiliating *878 Episcopal congregations in the Los Angeles Diocese  yes, the very same diocese who is the appellant here  were entitled to have control of the local church property, because in the cases of those local parish corporations, they took title to the property before the 1958 local diocesan canon which asserted that local Episcopalian parishes held property in trust for the diocese. The property of the fourth corporation, however, was indeed held in trust because the articles of incorporation of that particular corporation acknowledged a trust. (See id. at pp. 625-626, 171 Cal. Rptr. 541.)
The four-factor neutral principles approach requires an examination of not just the deeds and articles of incorporation, but also of the constitutions, canons and rules of the general church. Usually, of course, a hierarchical church is going to have at least a canon or rule, if not a full-scale provision in its constitution, subordinating property of local church corporations to itself. By the time Barker was decided, the 1958 local diocesan canon had been promulgated. Why didn't it make a difference?
The issue was addressed on page 624, 171 Cal.Rptr. 541 of the official reporter: The 1958 diocesan canon wasn't around when the three winning church parishes were incorporated, so there was "nothing ... to create an express trust in local church property in favor of the general church." (Barker, supra, 115 Cal.App.3d at p. 624,171 Cal.Rptr. 541.)
It bears noting that Justice Roth dissented in Barker, and specifically recognized that, under the U.S. Supreme Court decision in Jones, the "hierarchical approach would also be acceptable." (Barker, supra, 115 Cal.App.3d at p. 627, 171 Cal.Rptr. 541 (dis. opn. of Roth, J.).) He then pointed out that the majority "accomplish[ed]" the change from hierarchy to neutral principles "by virtue of the fact that the State of Georgia" had "availed itself of the neutral principles theory" together with the "assertion" that the Church of Palm Springs court had placed California in that "`camp.'" (Ibid.) For Justice Roth, the Church of Palm Springs' assertion was an "overstatement," though he did not elaborate. (Ibid.)
Turning to the merits, Justice Roth proposed that whether neutral principles or hierarchy should apply would "depend on the circumstances" (Barker, supra, 115 Cal.App.3d at p. 627, 171 Cal.Rptr. 541 (dis. opn. of Roth, J.)), and the circumstances of the case were such that even if "no express trust affirmatively" appeared, the hierarchical structure of the Episcopal Church should be "the controlling consideration." (Id. at p. 628,171 Cal.Rptr. 541.)

F. Statutory Developments

1. Section 9142
The next legal development in California's law in this area was statutory, namely the addition of subdivisions (c) and (d) to section 9142. (See Stats.1982, ch. 242.)
There is no indication that in doing so the Legislature had any intention of codifying Barker, or of overturning California Supreme Court precedent as found in the Baker-Wheelock line. The legislative history[8] of the addition to section reveals a rather different intent altogether: To make a technical correction to earlier (and pre-Barker) legislation (specifically, Stats. 1980, ch. 1324), which had precluded California's Attorney General from enforcing charitable trusts of religious corporations but left no one else with the ability to *879 enforce such a trust either. That earlier legislation had left a "void" as far as the enforcement of property held in trust by religious corporations, and the 1982 additions to section 9142 were part of a package to "fill" that "void." (See, e.g., Policy Committee Memorandum re Bill SB 1178, Amended 3-8-82, from the Assembly Judiciary Committee, at p. 2 ["First Freedom, the sponsor of this bill, states that section one of the bill is intended to `fill a void' left by the passage of SB 1493 (Petris), Ch. 1324, Statutes of 1980."].)
In more specific terms, the origins of the legislation that led to subdivisions (c) and (d) in section 9142 can be traced to events described by the court in People ex rel. Deukmejian v. Worldwide Church of God Inc. (1981) 127 Cal.App.3d 547, 178 Cal. Rptr. 913 (Deukmejian v. WCG).
In that case "certain members" of a "hierarchically structured" church contacted a New Jersey law firm "expressing their concern that officials of their Church might be guilty of malfeasance and misfeasance with respect to Church affairs." (Deukmejian v. WCG, supra, 127 Cal. App.3d at p. 550, and 550, fn. 2, 178 Cal. Rptr. 913.) The New Jersey firm contacted a California lawyer for assistance.
The California lawyer determined that the complaining church members themselves had no "standing to sue," so he contacted the California Attorney General's office whose duties at the time included "surveillance of charitable trusts." (Deukmejian v. WCG, supra, 127 Cal. App.3d at p. 550, 178 Cal.Rptr. 913) The Attorney General's office then "deputize[d]" the California lawyer as a "special deputy attorney general." The office and the California lawyer took the position the church's "property, assets and records were `public' and that they were always and ultimately in the custody of and subject to the supervision of the courts upon application of the Attorney General." (Id, at p. 551. 178 Cal.Rptr. 913.) Based on that theory the California Attorney General's office and the California lawyer were successful, for a while, in imposing a receivership on the church on the ground that the "Church property was being misappropriated." (Id, at p. 552, 178 Cal. Rptr. 913.)
However, as the receivership continued into the first half of 1979, the church obtained relief in the Legislature. Senator Nicholas Petris introduced Senate Bill 1493 which repealed the statutory basis (former section 9230) on which the Attorney General had acted. Old section 9230 was replaced with new legislation (also numbered section 9230) which provided, with certain exceptions, that "the Attorney General shall have no powers with respect to any corporation incorporated or classified as a religious corporation under or pursuant to this code." (See Deukmejian v. WCG, supra, 127 Cal.App.3d at p. 554, fn. 5, 178 Cal.Rptr. 913.) Senator Petris' bill became law and was signed by the Governor in July 1980.
The Deukmejian v. WCG court would later note that "[e]ven though the legislation was not to become effective" until about a year later, "the Attorney General very wisely viewed that legislation as a declaration of public policy and a legislative objective to prevent the state from engaging in the very type of litigation" the Attorney General had brought. (Deukmejian v. WCG, supra, 127 Cal.App.3d at p. 555, 178 Cal.Rptr. 913.) These events were memorialized by the court when the California lawyer sought fees from the church for having imposed a receivership on the church, the denial of which the appellate court affirmed, noting that the whole receivership enterprise was "from the inception constitutionally infirm and predestined to failure." (Id. at p. 558, 178 Cal.Rptr. 913.)
*880 Senate Bill 1493 in 1980, which had proved decisive in the Deukmejian v. WCG litigation, was the stated reason for 1982's Senate Bill 1178, also carried by Senator Petris. The legislative history of the bill shows that the original sponsoring organization was First Freedom (a fact noted, for example), on the Senate Judiciary Background Information form ("SB 1178 (Petris)").
According to a memo from that organization (attached to the Judiciary Committee Background Information form), section 1 of the bill, amending section 9142, was to allow some litigation to enforce charitable religious trusts, since the earlier bill had stripped the Attorney General of that authority: "The Attorney General used the term `charitable trust' as a means of arrogating unto [sic[9]] himself virtually absolute power over all charitable organizations (including churches). SB 1493 deprived him of such overreaching authority .... [¶] However, while SB 1493 impliedly addressed the question of what a `charitable trust' is not, it did not address what a 'charitable trust' really is. There really is such an animal, and attorneys who litigate in the area of gifts and bequests feel it's a void that should be filled." (Memorandum by Brent Barnhart to Burt McChesney, attached to Senate Judiciary Background Information form ("SB 1178 (Petris)").)
The void to be filled (and here we meet again the spirit of Justice Harlan's concurring opinion in Hull Church) was the then-inability of church members to seek redress when their contributions were used in a manner contrary to the specific purpose for which the property was contributed. (See letter from Brent A. Barnhart, Legislative Advocate, to Governor Edmund G. Brown, on First Freedom stationary dated June 7, 1982 at p. 1 ["SB 1178 accomplishes two things pertaining to court actions to enforce the terms of donations to a church: [¶] (1) It defines when gifts and contributions to a church create an enforceable charitable trust; and [¶] (2) It creates a new cause of action for church members who have contributed money or property to their church for a specific purpose, where their contribution has been used in a manner contrary to the specific purpose for which it was contributed." (Original underlining.) ])
According to the same letter, the bill was the "product of extensive discussion and compromise between representatives of several religious organizations" which included the Catholic Archdiocese of Los Angeles, the Jewish Community Relations Council of Los Angeles, and the Pacific Union Conference of Seventh-Day Adventists as well as First Freedom. (Ibid.)
It is apparent from the legislative history of Senate Bill 1178 that the Legislature's main focus was on the problem of what remedies individual contributors to religious corporations, no matter how ecclesiastically organized, might have for the misuse of their "specific purpose" contributions. The April 16, 1981 newsletter from First Freedom (on page 2) contained in the legislative history also contains a description of Senate Bill 1178, elaborating thusly on the issue of specific purpose contributions, and tying the effort to the Attorney General's perceived overreaching in the Deukmejian v. WCG case: "Senator Nicholas Petris, author of SB 1493, has introduced clean-up legislation which should lay to rest further misuse of the term `charitable *881 trust'.... [¶] SB 1178 declares what a charitable trust is, with respect to religious organizations. Enforceable charitable trusts will be those expressly established by donors in gifts to churches, on condition that the gifts be used in specific ways." (Original underlining; italics added.)
However, it must be noted that (as one might expect given the origins of SB 1493 enacting a new section 9230), the power of an individual contributor to enforce a specific purpose gift against a religious corporation was somewhat restricted. (Recall from Deukmejian v. WCG, supra, 127 Cal. App.3d 547, 178 Cal.Rptr. 913, that the California attorney sought out by the New Jersey law firm concluded that individuals had no standing to enforce their allegations of malfeasance.) A writing at the time of the donation expressly creating a trust would be required.
As we have noted, one looks in vain in the legislative history of subdivisions (c) and (d) for any reference to the Barker decision (much less any intent to codify it), or any intent to reverse the common law of California dealing with church property disputes arising in the context of a struggle over property between a local church and a general church that was the subject of so much California Supreme Court common law jurisprudence. Any impact that the legislation may have had on that common law must therefore be by operation of the plain language of the statute, because there is certainly no indication of any legislative intent to do so. As our Supreme Court has declared, courts should not interpret a statute to "alter the common law" unless there is "language or evident purpose of the statute" manifesting "a legislative intent to repeal" a common law rule. (California Assn. of Health Facilities v. Department of Health Services (1997) 16 Cal.4th 284, 297, 65 Cal.Rptr.2d 872, 940 P.2d 323.[10])
With that principle in mind, let us now turn to the language of section 9142.
Subdivisions (c) and (d) of section 9142 provide:
"(c) No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies:
"(1) Unless, and only to the extent that, the assets were received by the corporation with an express commitment by resolution of its board of directors to so hold those assets in trust.
"(2) Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide.
*882 "(3) Unless, and only to the extent that, the donor expressly imposed a trust, in writing, at the time of the gift or donation.
"(d) Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments creating the trusts. However, nothing in this subdivision shall be construed to permit the amendment of the articles to delete or to amend provisions required by Section 214.01 of the Revenue and Taxation Code to a greater extent than otherwise allowable by law." (Italics added.)
The major phrases of the statute are important: The very footfalls of Watson's reference to "subordinate member of some general church" echo in the statutory phrase "superior religious body or general church." We note:
First, there are three possible ways for a religious charitable trust to be enforced, any "one" of which will do. This aspect is important because it means that there is more than one way a trust can be impressed on property held by a religious charitable corporation. The most obvious way, of course, is the one described in subdivision (c)(3): an individual donor expressly imposing a trust, in writing, on his or her donation.
However, under the canon of statutory construction that courts should not construe words in statutes to be redundant, the way described in subdivision (c)(2)  a "superior religious body or general church" expressly providing for a trust  must be considered meaningfully different from the imposition of a trust by an individual donor in writing as described in subdivision (c)(3).
Second, one must note the disjunctive "or" that separates the phrase, "the articles or bylaws of the corporation" from the words "governing instruments of a superior religious body or general church." Under the ordinary meaning of the word "or"  either of two alternative are sufficient  it makes no difference if the "bylaws or articles" in a church corporation holding title to property expressly provide for a trust as long as the "governing instruments" of the "superior religious body or general church of which the corporation is a member" so provide.
Third, one should note the phrase "superior religious body or general church" in conjunction with the word "or." The phrase clearly contemplates an intent by the Legislature to insure that hierarchically organized churches had the power to trump "local corporations" when the local corporation was a "member" of the hierarchically-organized church as to whether an enforceable trust might exist. If the Legislature had wanted the local church corporations to have the power to prevent hierarchically-organized churches from imposing a trust on the property of the local church corporations, it would not have used the word "or." The Legislature would have said "and," thus requiring both local corporation and general church agreement.
Finally, we come to the critical phrase in subdivision (d), "governing instruments creating" the trust. The phrase raises the question of what, exactly, are those "governing instruments" that "create" the trust.
Now the importance of subdivision (c)(3) becomes apparent. Governing instruments can certainly, under subdivision (c)(3), include the "writing," made by the donor at the time of the gift or donation. That is a logical reading of subdivision (c)(3).
However, since subdivision (c)(3) is not the exclusive way by which a trust may be enforced, the natural reading of subdivision (c)(2), when read together with subdivision (c)(3), is that "governing instruments" as used in the more general *883 subdivision (d) also includes the "governing instruments of the superior religious body or general church" as the phrase is used in subdivision (c)(2). And that means that, yes, it is the general church or superior religious body that, indeed, creates the trust under subdivision (c)(2).
Of course, that very scenario  the general church and not the local church as the actual trustor of the trust  had been invited by the United States Supreme Court in Jones. Recall that Jones suggested an alternative to modification of deeds or corporate charters to insure that "the faction loyal to the hierarchical church will retain the church property." (Jones, supra, 443 U.S. at p. 606, 99 S.Ct. 3020.) Specifically, the alternative was that the "constitution of the general church can be made to recite an express trust in favor of the denominational church." (Ibid.) The idea that a hierarchical general church could expressly provide in its rules that the property of a local church affiliated with that denominational church was held in trust for the denominational church thus does not seem to be as outlandish as the California-Nevada court would later find it.
We need not (and do not) in this opinion address issues arising out of subdivision (c)(3) scenarios (i.e., an individual suing to impress a trust based on a specific purpose donation). What is abundantly clear, however, for our purposes in this case is that in a hierarchically organized church, the "general church" can impress a trust on a local religious corporation of which the local corporation is a "member" if the governing instruments of that superior religious body so provide.
In the case before us, the enactment by the national Episcopal Church in 1979 of Canon 1.7(4) readily qualifies as a "governing instrument" expressly providing for a trust on property held by local church corporations. The language of the statute perfectly conforms with the result that would be otherwise required under a flat-out "principle of government" approach under Watson and the Baker-Wheelock line of California Supreme Court cases. And the Barker case becomes readily distinguishable because it was decided before Senate Bill 1178, with its contemplation of express trusts to be found in the "governing instruments" of a "general church."
Also, because of Canon 1.7(4), we are spared in this case the thorny constitutional issue of whether section 9142 might be unconstitutional as applied to a hierarchically organized church whose governing instruments didn't have any express trust provision on the theory that the hierarchically organized church's own religious freedom to organize itself as it deemed fit is being subverted by the statute. We do not express any opinion on that question.
Now, the counter-analysis to what we have determined to be the plain language of section 9142, subdivisions (c)(2) and (d) is the proposition that it would be counter to ordinary state law trust principles, which in California start with the presumption that a trustor creating a trust retains the power to revoke it. To get ahead of ourselves, that would be the rationale latter used by the court in California-Nevada, supra, 121 Cal.App.4th 754, 17 Cal.Rptr.3d 442.
There is nothing wrong with the trustor-may-revoke rationale of California-Nevada  after all that is what subdivision (d) literally provides for  just as long as one is clear about who, exactly, is the trustor. But, as we have just seen, a "general church" is, functionally, the trustor in a subdivision (c)(2) situation.
But that is only common sense anyway: In a general church that is hierarchically-structured, people do not organize local congregations as substantively independent *884 entities. They organize local congregations in the context of membership in the overall church. In contrast to congregational organization, hierarchical organization makes the overall church the primer mover.

2. The Title Presumption of Evidence Code Section 662
As we shall see when we discuss Korean United's treatment of Church of Palm Springs, one can detect in Church of Palm Springs a very strong emphasis on legal title. Indeed, Korean United would ascribe the rationale of Church of Palm Springs almost entirely to a reliance on "bare title." (See Korean United, supra, 230 Cal.App.3d at p. 498, 281 Cal.Rptr. 396 ["Focusing instead on bare title to the property ...."] (italics added).)
That raises the question of how the title presumption in California law, now codified as section 662 of the Evidence Code, fits in church property disputes of this sort.[11] It is true that section 662 was enacted in 1965, after the Supreme Court's Baker-Wheelock line of cases. But there is nary a hint that the statute was enacted to change the common law involving church property disputes, in which, typically, title is never really disputed, only the use of the property. The Law Revision Commission Comment to the legislation points out, "Section 662 codifies a common law presumption recognized in the California cases." (29B West's Annot. Evid.Code, p. 210.) And that presumption had been around prior to the Baker-Wheelock line. (E.g., Roman Catholic Archbishop of San Francisco v. Shipman (1889) 79 Cal. 288, 296, 21 P. 830 ["It must be presumed that Alemany held possession under the legal title vested in him by the deed...."].)
Moreover, at least in this case, any arguable idea that section 662 somehow required departure from the result required by principle of government rule is untenable for three reasons.
First, section 9142 is a more specific statute, as well as a later one, and trumps any conflict with Evidence Code section 662. (See Garcia v. McCutchen (1997) 16 Cal.4th 469, 476-477, 66 Cal. Rptr.2d 319, 940 P.2d 906.) If the diocese and national church have valid claims under the plain language of section 9142, the more general Evidence Code section 662 cannot block them.
Second, particularly when read in conjunction with section 9142, Canon 1.7(4) is clear and convincing evidence rebutting any presumption that the beneficial interest in the local church property is solely controlled by the local parish corporation.
And third, and most importantly, Evidence Code section 662 is substantially irrelevant to the dispute in this case. In precise terms, the diocese's and national church's claims are not that they have "beneficial title" to the property, but that the party who does have beneficial title, the local parish corporation, holds that beneficial title in trust for them.
And with that we now turn the decisions that followed after Church of Palm Springs and Barker.

G. The Latter-Day California Intermediate Appellate Decisions in the Wake of Church of Palm Springs, Barker, and Section 9142
Since Barker was decided and section 9142 was enacted, four cases from California's intermediate appellate court have directly *885 dealt with disputes over church property in a way that implicates Watson and the Baker-Wheelock line's principle of government approach: Korean United, supra, 230 Cal.App.3d 480, 281 Cal.Rptr. 396; Singh v. Singh (2004) 114 Cal.App.4th 1264, 9 Cal.Rptr.3d 4 (Singh); California-Nevada, supra, 121 Cal.App.4th 754, 17 Cal.Rptr.3d 442; and finally, Concord Christian, supra, 132 Cal.App.4th 1396, 34 Cal.Rptr.3d 412.[12] A fifth case, Berry v. Society of Saint Pius X (1999) 69 Cal. App.4th 354, 81 Cal.Rptr.2d 574 (Saint Pius X), is also significant because, although it did not deal with a church property dispute as such (it dealt with who was the proper successor in a corporate sole), it marked a rediscovery of the Supreme Court's Wheelock opinion and (in our opinion) a correct reading and application of that opinion.
Also, while all four direct dispute cases professed to follow the four-factor neutral principles approach, at least two (Guardian Angel and California-Nevada) cannot be reconciled with each other. When we examine them, we also find that two cases are consistent with the Watson principle of government approach, and in fact Korean United actually used that approach as an alternative rationale. (The other is Guardian Angel.) One isn't consistent (California-Nevada ), and one is neutral (Singh ).

1. Korean United
Against the backdrop of Palm Springs and Barker, Korean United represents a kind of counter-reformation, in which California courts were willing, once again, to defer to the highest governing tribunals of a church.
Korean United, involved a local Presbyterian congregation, incorporated as a religious nonprofit corporation. A "schism" developed within the local congregation over the views of its pastor; the pastor had the support of the majority of the congregation, and the pastor sought to disengage himself and his supporters from the national Presbyterian church; the "dissident faction" went elsewhere to worship, but the local presbytery (equivalent to a Episcopal diocese) declared this "`exiled'" faction to be the "`true Church'" congregation (like Horsman, the court in Korean United showed no reticence to use the phrase), the local pastor fired the first shot with a quiet title action, followed by a cross-complaint from the local presbytery for enforcement of an express trust. The trial court followed Barker and held there was no trust, declaring the local congregation *886 corporation in control of the church property.
The appellate court reversed. The court was nice to the earlier Barker decision: That opinion represented, at the time, "not only the latest, but the most definitive appellate consideration of the legal principles concerning church property disputes in California." (Korean United, supra, 230 Cal.App.3d p. 496, 281 Cal.Rptr. 396.)
That said, the Korean United headed off in a direction fundamentally inconsistent with Barker. First of all, unlike Barker (or Church of Palm Springs), Korean United became the first California appellate court to recognize that Jones was permissive in its articulation of neutral principles analysis. State law could use the four-factor neutral principle test, and that was okay, but states could also defer to the rulings of the "authoritative ecclesiastical body" at least as far as religious controversies were involved. Here is the key passage: "The conclusion to be drawn from Jones is that a state court may resolve disputes over church property through use of neutral principles of law, focusing on sources such as deeds to church property, articles of incorporation, bylaws, state statutory law and the constitution and rules of the general church; but if a civil court is required to resolve a religious controversy, it must then defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." (Korean United, supra, 230 Cal.App.3d at p. 498, 281 Cal.Rptr. 396.)
The Korean United also confronted the ruling in Church of Palm Springs and politely and obliquely criticized it: That is, the Korean United said that the Church of Palm Springs court "accepted" the "invitation to resolve church property disputes through application of neutral principles of law" (Korean United, supra, 230 Cal. App.3d at p. 498, 281 Cal.Rptr. 396) but noted its ruling was based on a rather constricted focus on bare title: "Focusing instead on bare title to the property, the [Palm Springs] court upheld the trial court's ruling that ownership and possession of the disputed church property remained with the local church." (Ibid., our italics, citing Church of Palm Springs, supra, 89 Cal.App.3d at pp. 923, 933, 152 Cal.Rptr. 854).
Later in the opinion, however, the Korean United court made it clear that the trial court had "misapplied" the four neutral principles factors to rule in favor of the local church, because the trial court "improperly looked at each of the factors separately to see if an express trust was present in any one of them. However, the court, as a matter of law, should have looked at these factors collectively, asking whether under the totality of the circumstances, they required a finding of express trust." (Korean United, supra, 230 Cal. App.3d at pp. 509-510, 281 Cal.Rptr. 396, italics added.)
The implication of Korean United is clear, if politely stated: If the trial court had erred in Korean United by looking at the four-factors separately, rather than collectively, then how much more did the Church of Palm Springs court err in only looking at one factor individually, that is, "bare title." And if there is one mistake the Korean United court was determined not to make, it was to constrict its focus to one factor separately and base its decision to reverse only that factor.
Structurally, one can divine from Korean United a host of parallel rationales, all of which were rolled up into a ball and hurled toward an overwhelming resolution: The trial court erred.
The first rationale was based the rediscovery of the principle of government approach. Justice Fred Woods and his colleagues became the first jurists on the intermediate appellate court in decades to *887 apply the rationale of the controlling precedent of the state's highest court to a church property dispute. In a section of the opinion citing Wheelock, Horsman, Kedroff, and Serbian Eastern Orthodox (see Korean United, supra, 230 Cal.App.3d at pp. 500-503, 281 Cal.Rptr. 396), the Korean United court held that the trial court had erred in "fail[ing] to defer" to the decision of the presbytery, which was authoritative under the Presbyterian constitution known as the "Book of Order." (Korean United, supra, 230 Cal.App.3d at p. 502, 281 Cal.Rptr. 396.)
However, as an independent alternative rationale the Korean United court then down the line on each factor of the four neutral principles (see generally Korean United, supra, 230 Cal.App.3d at pp. 503-513, 281 Cal.Rptr. 396), including the operation of the Corporations Code sections that folded the rules of the national church into the bylaws of the local corporation controlling the property, and creating the presumption of an express trust. (Id. at pp. 503-509, 281 Cal.Rptr. 396.) Another rationale was the nature of the deeds, because the Presbytery had held the property in its own name before a 1983 loan. (Id, at pp. 509-510, 281 Cal.Rptr. 396.) Further, the articles of incorporation had expressly noted a statute that itself recognized the power of "national" bodies over "subordinate" ones (old Civ.Code § 605dd, part of stats 1939 ch. 148 § 2, p. 1262). (See Korean United, supra, 230 Cal. App.3d at p. 511, 281 Cal.Rptr. 396.)
And, finally, there was the national constitution of the Presbyterian Church embodied in its Book of Order that had been amended in the wake of Jones to provide that local congregations hold property in trust (Korean United, supra, 230 Cal. App.3d at p. 512, 281 Cal.Rptr. 396).

2. Saint Pius X
About eight years after Korean United, the court in Saint Pius X, supra, 69 Cal. App.4th 354, 81 Cal.Rptr.2d 574 had occasion to confront the issue of church property disputes in the context of the arcane subject of corporate soles (see Corp.Code, §§ 10000 through 10015).
The classic model for a corporate sole is an Archbishop in the Roman Catholic Church who is himself a corporate sole, owning property in a given diocese. (E.g., Roman Catholic Archbishop of San Francisco v. Superior Court (1971) 15 Cal. App.3d 405, 411, 93 Cal.Rptr. 338 ["The Archbishop is a corporation sole under the California Corporations Code ...."]; see also Nadborny, "Leap of Faith" Into Bankruptcy: An Examination of the Issues Surrounding the Valuation of a Catholic Diocese's Bankruptcy Estate (2005) 13 Am. Bankr.Inst. L.Rev. 839, 848 ("Nadbourny Bankruptcy Article").) The basic idea is that a single individual, as a subordinate in a hierarchically organized church, can own church property in a given area yet the church still ultimately controls the property by controlling the officeholder. (See Nadbourny Bankruptcy Article, supra, 13 Am. Bankr.Inst. L.Rev. at pp. 848, 850 ["The corporation sole was developed in England for the express purpose of passing the use of church property to successive generations at the parish level in order to prevent the monarch from seizing church properties upon the death of the bishop.... [¶] The fact that legal title rests in the hands of the bishop as a corporation sole does not change the Canonical ownership as ordained by the Catholic Church."].)
And it was precisely the problem of who exactly controlled a corporate sole that came to the fore in Saint Pius X. The case involved the followers of Archbishop Marcel Lefebvre, who in the words of the *888 opinion, practice "Roman Catholicism as it existed before Vatican II," that is, they were an "independent" church. (Saint Pius X, supra, 69 Cal.App.4th at p. 358, 81 Cal.Rptr.2d 574) A particular priest had formed a corporation sole in 1976. The original articles of incorporation provided that any vacancy would be made by the "presiding Archbishop following the canons of the Roman Catholic Church." (Ibid.) However, the priest later attempted to change the manner of succession so that he would control his successor.
Not so, said the Saint Pius X court after the original priest died, and two successors, the original priest's hand-picked successor and one chosen by the larger church, vied for control of the church property: The appellate court focused on section 10010 of the Corporations Code governing corporate soles, which contemplates filling vacancies "`by the religious organization governed by the corporation.'" (See Saint Pius X, supra, 69 Cal.App.4th at pp. 366-367, 81 Cal.Rptr.2d 574.)
The court first noted that a "`principal purpose of the corporation sole is to insure the continuation of ownership of property dedicated to the benefit of a religious organization which may be held in the name of its titular head.'" (Saint Pius X, supra, 69 Cal.App.4th at p. 367, 81 Cal. Rptr. 2d 574, quoting County of San Luis Obispo v. Ashurst (1983) 146 Cal.App.3d 380, 383, 194 Cal.Rptr. 5 (Ashurst).) The court's central point was that, under California law, a corporation sole and the religious organization using the corporation sole as a legal device are not one and the same, so that the individual office holder does not control the succession to the property, it is, instead, the larger religious organization. (See Saint Pius X, supra, 69 Cal.App.4th at p. 370, 81 Cal.Rptr.2d 574 [rejecting argument that original priest was "synonymous with the religious organization governed by the corporation"].)
The Saint Pius X court relied heavily on the Ashurst decision, which was an execution sale case, based on a debt for medical services provided by a county to the wife of the office holder of a corporate sole. Writing for the court and quoting Blackstone, Justice Gilbert noted the "severability of title and ownership as between the unincorporated religious organization and the individual officeholder as the corporation sole." (Ashurst, supra, 146 Cal. App.3d at p. 384, 194 Cal.Rptr. 5.) That is, "the assets must remain with the religious organization" once title has vested in the office holder as corporate sole. The county thus could not obtain a writ of execution on the assets of the corporation sole to satisfy the debt for medical services of the office holder's wife. (See id. at pp. 384-385,194 Cal.Rptr. 5.)
And, perhaps most important for our purposes, Saint Pius X continued with the rediscovery by California's lower intermediate level appellate courts of the proposition from Wheelock that religious corporations are not to be confused with the ecclesiastical bodies to which the corporation may be ecclesiastically subordinate. Here is the key passage from Saint Pius X noting the original "convenience" language from Wheelock, and adding its own emphasis: "As the trial court observed, in the early case of Wheelock ... (although not involving a corporation sole) the Supreme Court explained the relationship of a religious corporation to the congregation or church membership as follows: `The ... Code of this state ... expressly permits religious bodies to incorporate, but such incorporation is only permitted as a convenience to assist in the conduct of the temporalities of the church. Notwithstanding incorporation the ecclesiastical body is still all important. The *889 corporation is a subordinate factor in the life and purposes of the church proper. A religious corporation ... is something peculiar to itself. Its function and object is to stand in the capacity of an agent holding the title to the property, with power to manage and control the same in accordance with the interest of the spiritual ends of the church....."The legislature never means by granting or allowing such charters to change the ecclesiastical status of the congregation, but only to afford them a more advantageous civil status."'" (Saint Pius X, supra, 69 Cal. App.4th at p. 371-372, 81 Cal.Rptr.2d 574 (italics added by Saint Pius X court).)

3. Singh
Singh, supra, 114 Cal.App.4th 1264, 9 Cal.Rptr.3d 4, is significant for several reasons, not the least of which is that it was the first California case since the U.S. Supreme Court's 1979 Jones case to systematically review the federal precedents, including Watson, Hull Church, Serbian Eastern Orthodox as well as Jones. (See Singh, supra, 114 Cal.App.4th at pp. 1275-1281, 9 Cal.Rptr.3d 4.) Church of Palm Springs had cited those cases to be sure, but it hadn't taken them on one by one. Perhaps because of that systematic review, the Singh court declared that it did not "necessarily agree" with the idea that certain California cases "decided in the 1950's"  which certainly included both Rosicrucian, supra, 39 Cal.2d 121, 245 P.2d 481 and Providence Baptist, supra, 40 Cal.2d 55, 251 P.2d 10  could not "be reconciled with the United States Supreme Court holdings." (Singh, supra, 114 Cal. App.4th at p. 1281, 9 Cal.Rptr.3d 4, italics added.)
The case is also significant because it was, functionally, a homage to Providence Baptist, that is, it yielded exactly the result that a reading of Providence Baptist would predict for a congregationally organized church using the principle of government.
The Singh case was, of course, a little more complex than that: It arose out of the claims of two competing boards (called "the Supreme Council") in a Sikh Temple. The losing slate essentially contended that they had been elected for life, in accordance with what they claimed was the proper Sikh tradition. The temple was congregationally organized, with an elected board, but (shades of the British Parliament in the time of Charles I) the otherwise detailed bylaws did not address the question of how long the board was to serve. Since the temple had organized itself as a "nonprofit religious corporation" subject to the rules set for in section 9110 et seq. of the Corporations Code (Singh, supra, 114 Cal.App.4th at p. 1282, 9 Cal. Rptr.3d 4), the trial court had looked to section 9220, which provides that in the absence of any provision in the articles or bylaws, the term of office for a board of directors is one year. That determination, in effect, validated the claims of one slate of directors. The trial court also  in the tradition of Providence Baptist that basically had done the same thing approved about 50 years before  provided for a court supervised election.
The losing slate appealed; its core argument was that the trial court did not have jurisdiction to adjudicate the dispute at all. The bylaws did indeed make reference to "the Gurmat tradition" and the "Panj Pyaras" within the Sikh religion. (Singh, supra, 114 Cal.App.4th at pp. 1269, 1275, 9 Cal.Rptr.3d 4.) It was in the context of discussing jurisdiction that the Singh court addressed the U.S. Supreme Court cases from the 1970's, as well as Rosicrucian and Providence Baptist. The court ultimately held that the trial court's decision to apply section 9220 was correct as an application of neutral principles. There *890 was no conflict between a neutral principles approach and the principle of government approach, because the principle of government of the Sikh temple was the local corporation (controlled by a board elected by majority rule) specified in the bylaws.
That point, however, requires a little more elaboration. There was no doubt in Singh that the controlling board was to be elected by majority rule. However, the court also noted that an article in the bylaws also made a particular priest the "chief consultant" in "matters related to the Gurmat and Sikh Rehatmaryada." (See Singh, supra, 114 Cal.App.4th at p. 1283, fn. 20, 9 Cal.Rptr.3d 4.) Any "matter of doubt" was to be decided in a hierarchy of specified individuals. (Ibid.) That particular priest had not, however, spoken "regarding the term of office for the Supreme Council." (Ibid.) Hence, the Singh court took care, in justifying the trial court's decision to hold an election as not conflicting with any ecclesiastical hierarchy: "Further, the trial court did not determine who was qualified to be a member or who should be a member of the Supreme Council. Rather, the court's ruling that an election should occur resulted from the application of neutral principles of law and the Corporations Code when interpreting the bylaws. We stress that this case is significantly different from those situations where a religious authority has spoken on the issue. Not only has no religious authority spoken, but the Sikh Temple has no viable means of resolving this issue." (Singh, supra, 114 Cal. App.4th at p. 1285, 9 Cal.Rptr.3d 4.)
In short, the Watson and Baker-Wheelock principle of government approach was beginning to recover the respect it had lost with the Metropolitan Baptist, Wilson, Church of Palm Springs' and Barker cases. The revival would continue with Guardian Angel.

4. Guardian Angel
Guardian Angel, supra, 118 Cal.App.4th 919, 13 Cal.Rptr.3d 552 is an example of how neutral principles analysis which properly takes into account the written constitution of a hierarchical church (plus its canons and rules) will often yield the same result as a highest tribunal analysis. The case is also totally congruent with Saint Pius X's iteration of the Wheelock doctrine that church corporations serve as agents for churches that use them for its temporal ends.
The split between the local and the general church in Guardian Angel does not appear to have been theological at all. Rather, it was over financial accountability of the local church to the general church.
In Guardian Angel, a parish operated for about 39 years "in union" with the local diocesan bishop of the general church that operated "in union" with the Prime Bishop of the church back in Pennsylvania. (Guardian Angel, supra, 118 Cal.App.4th at p. 929, 13 Cal.Rptr.3d 552.) When a new diocesan bishop was appointed in 1999, he requested the local priest to provide him certain financial information. The local priest failed to do so. A new local board of directors was soon elected, and that board severed ties with the general church, even to the point of hiring security guards to prevent those parishioners who remained loyal members of the general church from entering the premises. (The new board even refused donations from loyalist members. (Guardian Angel, supra, 118 Cal.App.4th at p. 926,13 Cal.Rptr.3d 552.)) The general church constitution, however, required diocesan approval of any newly elected board, but it was clear that this newly elected board never got it. (Ibid.) The trial court found the property belonged to the local church, but the appellate court reversed.
*891 The Guardian Angel court began with the premise that courts "must" apply neutral principles analysis, for which it cited page 449, 89 S.Ct. 601, of the Hull Church case, but only quoted a fragmentary clause from the Hull Church opinion. Here is what the Guardian Angel court said: "In settling a church property dispute, such as that currently before us, courts must apply 'neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which [the] property is awarded.' (Presbyterian Church v. Hull Church (1969) 393 U.S. 440, 449 [parallel cites omitted]." (Guardian Angel, supra, 118 Cal.App.4th at p. 930,13 Cal.Rptr.3d 552.))
From there, it identified the usual four factors used in neutral principles analysis. (Guardian Angel, supra, 118 Cal.App.4th at p. 930, 13 Cal.Rptr.3d 552, citing Barker, supra, 115 Cal.App.3d 599, 621, 171 Cal.Rptr. 541.)
It then quoted Metropolitan Philip v. Steiger (2000) 82 Cal.App.4th 923, 932, 98 Cal.Rptr.2d 605 for the proposition that a general church's constitution "`can override any right the majority of a local congregation might otherwise have to control the local church property.'" (Guardian Angel, supra, 118 Cal.App.4th at p. 930, 13 Cal.Rptr.3d 552.)
Having established that a general constitution can trump "any right the majority of a local congregation" have in local property, disposing of the case was an easy matter. The general church constitution required diocesan approval of a local church's board of directors before that board was authorized to act. So the actions of the board in "expropriat[ing]" the local property were not authorized. (See Guardian Angel supra, 118 Cal.App.4th at pp. 927, 930,13 Cal.Rptr.3d 552)
By the same token, the constitution of the general church (actually, there were two, a 1958 and a 1998 version) was clear that a parish only owns property "so long as" it conforms to the rules of the general church, and any dissolution of a parish will cause the property to revert to the national church. (Guardian Angel, supra, 118 Cal.App.4th at p. 931, 13 Cal.Rptr.3d 552).
The court further held that the reversion provision created a presumption of an express trust under section 9142, subdivision (c) of the Corporations Code. (Guardian Angel, supra, 118 Cal.App.4th at p. 931, 13 Cal.Rptr.3d 552, citing Korean United, supra, 230 Cal.App.3d at p. 508, 281 Cal.Rptr. 396, itself quoting from § 9142, subd. (c)(2).) That presumption was unrebutted by the mere fact that the local articles of incorporation did not "expressly" provide for reversion upon dissolution. (Guardian Angel, supra, 118 Cal. App.4th at p. 929, 13 Cal.Rptr.3d 552.)
Our own previous explication of section 9142 is wholly consistent with that conclusion. We have already shown, because of the "or" in subdivision (c)(2), that a trust may be enforced under the statute even if there is no provision for it in the local church's bylaws or articles.

4. California-Nevada
Guardian Angel was filed in late April of 2004; by mid-August, however, another case would be added to those intermediate appellate opinions which came down on the side of local control, California-Nevada, supra, 121 Cal.App.4th 754, 17 Cal.Rptr. 3d 442, sometimes also called "St. Luke's." Whereas Saint Pius X (quoting from Wheelock) and Guardian Angel (when provided for by the church constitution) had seen church corporations as distinct from and essentially subordinate to the religious organizations for which they were created, the California-Nevada court began with the local church corporation as the originating force behind subsequent property relationships.
*892 Preliminarily, we must note that it is significant that the viability of the principle of government or so-called hierarchical approach was not before the court in California-Nevada. The court expressly noted that neither party was pressing such an approach and both parties operated on the assumption that it didn't apply, (California-Nevada, supra, 121 Cal.App.4th at p. 763, 17 Cal.Rptr.3d 442 ["The parties here also appear to agree that the neutral principles of law theory is applicable in California, or at least that the hierarchical and implied trust theories do not apply."].)
It is clear from the opinion, though, that the California-Nevada court took it for granted that the "hierarchical theory" had been discredited, because that assumption played a role in its rationale, which was based on the proposition that a local church corporation in that case, like any trustor in California trust law, had the presumptive power to rescind a trust it had created. In direct contrast to Guardian Angel (see California-Nevada, supra, 121 Cal.App.4th at p. 771, 17 Cal.Rptr.3d 442 [acknowledging the opinion to be "at odds" with Guardian Angel]), the California-Nevada court explicitly rejected the idea that a general church's constitution could be dispositive, and did so on the ground that it would merely re-import hierarchical theory back into California law. (See id. at p. 772, 17 Cal.Rptr. 3d 442 ["Although the hierarchical theory has supposedly been rejected in California, it will nevertheless live on under the label of 'neutral principles of law,' if a church's own rules are viewed as trumping state statutes."].)
On the other hand, it is further noteworthy that the California-Nevada court assumed that hierarchical theory was discredited despite its use by Korean United court. To be sure, the California-Nevada court did make it clear that it disagreed with the Korean United opinion on the question of whether section 9142 created any presumptive trusts in favor of a general church, finding Korean United's reliance on the Ballentine & Sterling treatise misplaced, because the statute itself does not use any variation of the word "presumed." (California-Nevada, supra, 121 Cal.App.4th at p. 770, 17 Cal.Rptr.3d 442 ["Korean United ... describes ... 9142 as providing `presumptive rules...." This language appears to have come from a treatise.... Nothing in the statute itself, however, uses the word `presumption' or 'presumed.'"].)
On the other hand, one doesn't find in the opinion any confrontation with the fact that Korean United had relied upon the organizational principle as one of its several independent rationales to decide in favor of the general church.
Rather, for the California-Nevada court, the analysis of the church property dispute was a relatively straight-forward trust problem: In 1948, a local Methodist church incorporated with the express purpose of holding the church property in trust for benefit of the local church, albeit also with the purpose of maintaining a local church "as a part of and affiliated with the Methodist Denomination." (California-Nevada, supra, 121 Cal.App.4th at pp. 757-758, 17 Cal.Rptr.3d 442.) When an (unspecified) doctrinal dispute arose in the United Methodist Church in 1999 and 2000, the Methodist bishop attempted to replace the (apparently popular) existing local pastor. The local pastor (or his supporters) locked out the new pastor. The regional conference of the general church and related entities then sued the local church corporation for breach of charitable trust. (Id. at p. 760, 17 Cal.Rptr.3d 442.) The trial court reasoned that (a) a trust did indeed exist in favor of the general church and (b) the trust could not be unilaterally revoked by the local church corporation. *893 (See id. at p. 761, 17 Cal. Rptr.3d 442.)
The appellate court agreed with (a)  finding substantial evidence to support the idea that certain properties were indeed held by the local church corporation in trust for the general church. But, applying the traditional California rule that trusts are revocable unless expressly made irrevocable by the trust instrument (California-Nevada, supra, 121 Cal.App.4th at p. 767, 17 Cal.Rptr.3d 442, quoting Prob. Code, § 15400), it disagreed with (b). It held that the local church could keep the property by revoking the trust.
The syllogism used by the court went this way: The local corporation put some property into a trust for the general church. The trust instruments (in California-Nevada, certain deeds[13]) had created trusts for the general church (the deeds going to the local church corporation), but those instruments did not contain any language making the trust expressly irrevocable. Under California trust law, that made them revocable. Moreover, the fact that the constitution of the general church expressly provided that local churches hold property in trust for the general church was of no significance. "We know of no principle of trust law stating that a trust can be created by the declaration of a nonowner that the owner holds the property as trustee for the nonowner." (California-Nevada, supra, 121 Cal.App.4th at p. 769, 17 Cal.Rptr.3d 442.) In essence, the California-Nevada court treated the local corporation as any other initial owner creating a revocable trust and wanting the property back.
The California-Nevada decision was also the first California decision in the church property dispute area to consider in any detail the impact of Corporations Code section 9142, enacted in 1982. (Although the statute had played a subsidiary role in the rationales of both Korean United and Guardian Angel.)
The California-Nevada court took the position that "various legislative history materials" including the digest of the Assembly's Third Reading of the bill indicated that the purpose of the bill was "`to limit a religious corporation's property subject to a charitable trust. It requires certain actions to take place in order for a gift of property to be considered a charitable trust.'" (California-Nevada, supra, 121 Cal.App.4th at p. 770, 17 Cal.Rptr.3d 442, quoting Assembly Third Reading of Sen. Bill No. 1178 (1981-1982 Reg. Session.)) Which was, as we have shown, correct.
However, the California-Nevada court also concluded, in construing subdivisions (c) and (d) in section 9142, that those subdivisions were enacted to, in effect, codify Barker. After pointing out that nonowners cannot create trusts in their favor, the court said: "A more reasonable reading of the statute is that subdivision (c)(2) was intended to be a codification or recognition of Barker, supra, 115 Cal.App.3d 599[, 171 Cal.Rptr. 541]. This is especially so since subdivisions (c) and (d) were enacted shortly after Barker was decided. Barker was decided in January of 1981. Subdivisions (c) and (d) of Corporations Code section 9142 were enacted in 1982, and took effect in 1983." (California-Nevada, supra, 121 Cal.App.4th at p. 769, 17 Cal. *894 Rptr.3d 442.) That is, the court was rejecting the notion that a general church can "create a trust, in favor of itself by amending its constitution or rules to so provide. (Ibid.)
The California-Nevada court provided no authority for the idea that subdivisions (c) and (d) were enacted to codify Barker. We have already demonstrated in great detail that the idea is incorrect.

5. Concord Christian
And now we come to the latest church property dispute in California to date, Concord Christian, supra, 132 Cal.App.4th 1396, 34 Cal.Rptr.3d 412. Concord Christian is remarkable in that it confronted what appears to be the main (potential) difficulty with the Watson principle of government approach, namely whether it would require a civil adjudication of whether a church really was hierarchical or congregational. That adjudication might, in turn, implicate the civil court in theological controversy.
It bears emphasizing that in all the cases we have reviewed in this opinion, we have encountered no real disputes over the question of the nature of the church's organization. In Concord Christian, however, there had been an actual dispute over whether the denomination with which the secessionist local church had been formerly affiliated was hierarchical or congregational. The issue had been "Vigorously dispute[d]'" in the trial court with substantial evidence coming from "both sides." (Concord Christian, supra, 132 Cal. App.4th at p. 1409, 34 Cal.Rptr.3d 412.)
However, as it turned out, there was no occasion to wade into religious controversy at all: The constitution and by-laws of the general church plus the history of the local congregation and the "actions of the parties" (for example, by the secessionist pastor acknowledging the authority of the denomination before the split) provided not only substantial evidence to support the trial court's finding that the denomination was hierarchical, but also established that the local congregation had never been a "`strictly independent'" church "free of other ecclesiastical associations." (See Concord Christian, supra, 132 Cal.App.4th at pp. 1409-1411, 34 Cal.Rptr.3d 412.)
Like other post-Barker appellate opinions, Concord Christian operated on the premise that California law is the "neutral principles of law" approach, but seemed to equate the principle of government approach with such neutral principles. Consider this passage: "California courts apply the neutral principles of law approach, taking care in resolving church property disputes not to make determinations of underlying controversies over religious doctrine and polity. [Citations.] Accordingly, even where the matter at issue in a church dispute involves questions of ownership of property and assets, civil courts applying neutral principles of law must defer to the authoritative decisions of hierarchical ecclesiastical bodies on any matters of internal church polity necessarily involved in resolving the issue. [Citations.]" (Concord Christian, supra, 132 Cal.App.4th at p. 1412, 34 Cal.Rptr.3d 412, italics added.) The same sentiments might just as easily have been expressed by our state's high court in Wheelock, Committee of Missions, or Horsman.

H. Application
The rule of stare decisis reminds us that that common law is usually not the product of any one particular decision only, but of many generations of jurists focusing on a particular problem. In the case before us, for example, we have now ascertained that the approach articulated by the highest court in this state  directly in Baker, Wheelock, Committee of Missions, Horsman and Providence Baptist, and indirectly *895 in Rosicrucian Fellowship  has never been overruled or occluded by decisions of the United States Supreme Court. We have demonstrated that the federal supreme court has done nothing to affect the viability of these cases.
Of course, as a matter of state law (apart from matters of constitutional law), the Legislature can supersede decisions of a state's highest court. And yet we have also seen that nothing the Legislature has done would affect the principle of government approach in this case, where clear and convincing evidence exists that the "governing instrument" of a "general church" expressly impresses a trust on the property of a local church corporation.
In short, both stare decisis (at least in this case with Canon 1.7(4)), and, the proper construction of section 9142, coterminously favor the position of the general church. It is clear, then, that the trial court erred as to the second prong, going to the merits, of the anti-SLAPP statute in dismissing the case.
Now, it is not uncommon for appellate courts to bolster the result in a case before them by explaining that an alternative rationale leads to the same result. That happened in Korean United, where the court used the approach dictated by stare decisis (the principle of government) and then also reached the same result under the four-factor neutral principles approach.
In this case, however, we have decided that we should not engage in that sort of overkill. To be plain: Under the California Supreme Court cases of Baker, Wheelock, Committee of Missions, Horsman, and Providence Baptist (which are consistent with Rosicrucian Fellowship as well), the right of the general church in this case to enforce a trust on the local parish property is clear, and that right has not been affected by intervening United States Supreme Court decisions or any statute enacted by the Legislature. To the degree that section 9142 alters the common law rule enunciated by these cases, that alteration duplicates the result required under the common law given the facts of this case.

V. DISPOSITION
The judgments of dismissal against the diocese and the national church are both reversed. Further proceedings shall be consistent with this opinion. Appellants shall recover their costs on appeal.
MOORE and FYBEL, JJ., concur.
NOTES
[1] Korean United was overruled on another point in Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 743, footnote 11, 29 Cal.Rptr.2d 804, 872 P.2d 143. The point on which it was overruled is consideration by an appellate court of an appeal from severed issues without a final judgment, a subject that has nothing to do with religious property disputes.
[2] All references in this opinion to section 9142 will be to the Corporations Code.
[3] See section 425.16 of the Code of Civil Procedure. SLAPP is an acronym for Strategic Lawsuit Against Public Participation.
[4] See Eliot, The Hippopotamus (1920) ["The hippo's feeble steps may err/ in compassing material ends/ while the True Church need never stir/ to gather in its dividends."].
[5] There was, to be sure, a tiny bit of lingering implied trust theory reflected in the court's long quotation with clear approval from Judge Grant's dissent: Only if the governing body's act "`destroyed'" the "`identity'" of the church so that it "`thereby became a new and different church'" could the act of the governing body not be dispositive. (See Horsman, supra, 129 Cal. at pp. 137-138, 61 P. 796.) Even so, the Horsman court noted, though, that such identity-destroying acts would only arise "in very extreme cases  of which this is not one." (Id. at p. 138, 61 P. 796.) (And for what it is worth, or research has yet to uncover any California case employing a "destruction-of-identity" rationale in order to depart from what would be the result under a principle of government theory.) Since destruction-of-identity is an exception to Horsman's general approach of looking to the principle of government, it makes no difference for our purposes in this opinion whether that exception might be obviated by later United States Supreme Court cases that would caution against becoming involved in any religious controversy.
[6] To be sure, three times in the opinion the court used the word "fatalistic" to describe the doctrines of the U.S.A. group. (Committee of Missions, supra, 157 Cal. at pp. 112-113, 106 P. 395.) That makes no difference. As the recently popular saying went, whatever. Like the case before us, the Committee of Missions case would not turn on such local color.
[7] Actually, as the Wilson court said, St. James Armenian involved "no dispute whatsoever" about "ecclesiastical doctrine." (Wilson, supra, 67 Cal.App.3d at p. 511, 136 Cal.Rptr. 731.) There, a church sued the chairman of its parish council and a friend of his who was a real estate agent for not disclosing the agent's taking commissions on the sale of old church property and the purchase of new church property.
[8] The court has already granted a request by parties in a related case to take judicial notice of the legislative history of Senate Bill 1178 which originated the addition of subdivisions (c) and (d) to section 9142.
[9] The King James era archaism is arguably in keeping with the religious liberty purposes of sponsoring organization, "First Freedom," whose April 16, 1981 newsletter is part of the legislative history materials. (See First Freedom newsletter of April 16, 1981, p. 1 ["those concerned with religious freedom and the rights of churches, look to FIRST FREEDOM for support"].)
[10] Here is the complete text of the relevant passage from California Assn. of Health: "As a general rule, `[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.... "A statute will be construed in light of common law decisions, unless its language `"clearly and unequivocally discloses an intention to depart from, alter, or abrogate the commonlaw rule concerning the particular subject matter...."' Accordingly, `[t]here is a presumption that a statute does not, by implication, repeal the common law.... Repeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws.' ... Thus, the Department's position that the duties of long-term health care licensees are nondelegable under section 1424 is in accord with the common law of licensee liability, and we will presume it to be correct unless the language or evident purpose of the statute manifest a legislative intent to repeal the rule." (California Assn. of Health, supra, 16 Cal.4th at p. 297, 65 Cal. Rptr.2d 872, 940 P.2d 323, italics added.)
[11] The one-sentence statute provides in its entirety: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."
[12] One other case deserves mention as rounding out the law over church property disputes though it did not implicate the principle of government rationale of Watson and the Baker-Wheelock line. Vukovich v. Radulovich (1991) 235 Cal.App.3d 281, 286 Cal.Rptr. 547, another chapter in the history of the Serbian Orthodox Church, is not directly significant for our purposes since its main point was that the trial court was correct in sustaining a demurrer brought by a minority of a local congregation opposing reaffiliation with the "Mother Church." However, the case does illustrate the point that looking to "by-laws" to resolve a property dispute (as in "neutral-principles analysis") may not always prevent a civil court from entangling itself in religious controversy. In Vukovich, the congregational minority made an argument that, on its surface, was merely about voting procedure under the by-laws. The minority asserted that the votes of about 20 to 30 members of the congregation should have been counted on the vote on reaffiliation, but the board had improperly refused to count them. (Vukovich, supra, 235 Cal.App.3d at pp. 286-287, 286 Cal.Rptr. 547.) The trial court refused to entertain their suit i.e., sustained a demurrer because the court lacked jurisdiction, noting that "this dispute clearly involves an essentially ecclesiastical dispute" (Vukovich, supra, 235 Cal.App.3d at p. 290, 286 Cal.Rptr. 547.) Does that mean if property were involved the court would have had to wade into the bylaws? We need not deal with that problem in this case.
[13] The case involved nine parcels, the deeds to five of which had trust language in favor of the general church. In an analysis that followed the four-step neutral-principles factors, the California-Nevada court found there was substantial evidence that the other four were intended to have such trust language and concluded that all parcels had been put into a trust for the benefit of the general church. (California-Nevada, supra, 121 Cal.App.4th at pp. 764-766, 17 Cal.Rptr.3d 442.)